UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE
COMMISSION,

               Plaintiff,

    -against-

VALE S.A.,

               Defendant.

22 Civ. 2405 (RJD) (SJB)

**<u>ORAL ARGUMENT REQUESTED</u>**

**DEFENDANT VALE S.A.'S MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION TO DISMISS ALL CLAIMS**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................... 1

FACTUAL BACKGROUND ............................................................................... 3

I.     VALE'S OPERATIONS ............................................................................. 3

II.    BACKGROUND OF AUDITS CONDUCTED ON DAM 1 ............................... 4

A.     Regulatory Requirements For Dam Operators ........................................ 4

B.     Auditors Exercise Judgment In Calculating Safety Factors ..................... 5

C.     Vale Took Significant Steps Beyond The Regulatory Requirements
       To Enhance Its Dam Risk Management Practices .................................... 7

III.   AUDITORS CERTIFIED DAM 1 AS STABLE BETWEEN 2016
       AND 2018 ............................................................................................. 8

IV.    DAM 1 RUPTURED WITHOUT ANY SIGNS OF DISTRESS ........................ 13

V.     VALE'S POST-COLLAPSE REMEDIAL STEPS AND THIS
       ACTION ............................................................................................... 14

STANDARD OF REVIEW ............................................................................... 15

ARGUMENT ................................................................................................. 16

I.     THE COMPLAINT FAILS TO ALLEGE A STRONG
       INFERENCE OF SCIENTER .................................................................... 16

A.     The SEC Does Not Adequately Allege Motive And Opportunity ............. 17

B.     The SEC Fails To Adequately Plead Circumstantial Evidence That
       Vale Knew Or Recklessly Disregarded That Dam 1 Was Unstable ......... 18

       1.     Documents Incorporated In The Complaint Show That
              Dam 1 Appeared Stable ............................................................. 19

       2.     The SEC Does Not Adequately Allege That Vale
              Concealed Information From Or Improperly Pressured
              Auditors And Experts ................................................................ 23

a.  The Complaint Does Not Allege That Vale Played Any Role In Auditor A's Decision To Consider The Relevant Lab Data ................................................................ 24

b.  The Complaint Does Not Adequately Allege That Vale Withheld Information From Auditor B, And Incorporated Documents Show It Did Not ...................................... 25

c.  The Complaint Fails To Adequately Allege That Vale Pressured Auditor C ................................................... 27

3.  The SEC Fails To Adequately Allege That Vale Improperly Removed Auditors ........................................................................ 28

C.  The Complaint Fails To Allege Scienter Imputable To Vale ................................. 30

II.  THE SEC'S NEW ALLEGED MISSTATEMENTS ARE INACTIONABLE ........................................................................................ 32

A.  The Complaint Fails To Adequately Allege That Certain Challenged Misstatements Are False Or Misleading ................................................ 33

B.  Other Alleged Misstatements And Omissions Are Inactionable Statements Of Opinion And Must Be Dismissed .................................................... 34

C.  Certain Alleged Misstatements Or Omissions Must Be Dismissed As Inactionable Puffery ........................................................................................ 37

III.  THE SEC FAILS TO ADEQUATELY PLEAD MATERIALITY ....................... 38

IV.  THE SEC FAILS TO ADEQUATELY PLEAD SCHEME LIABILITY ........................................................................................................ 40

CONCLUSION ........................................................................................................ 40

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*Acito v. IMCERA Grp., Inc.*,
    47 F.3d 47 (2d Cir. 1995)........................................................................................16

*Altayyar v. Etsy, Inc.*,
    242 F. Supp. 3d 161 (E.D.N.Y. 2017) ...................................................................34

*Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*,
    28 F.4th 343 (2d Cir. 2022) .......................................................................16, 18, 33

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)........................................................................................ 15, 29-30

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007).......................................................................4, 19, 24, 29

*Barrett v. PJT Partners Inc.*,
    No. 16-CV-2841 (VEC), 2017 WL 3995606
    (S.D.N.Y. Sept. 8, 2017) .................................................................................. 17, 30-31

*Bldg. Trades Pension Fund of W. Pa. v. Insperity, Inc.*,
    No. 20 Civ. 5635 (NRB), 2022 WL 784017
    (S.D.N.Y. Mar. 15, 2022) ......................................................................................34

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
    752 F.3d 173 (2d Cir. 2014)........................................................................................37

*Dash v. Seagate Tech. (US) Holdings, Inc.*,
    No. CV 13–6329, 2015 WL 1537543
    (E.D.N.Y. Apr. 1, 2015)........................................................................................18

*Denny v. Barber*,
    576 F.2d 465 (2d Cir. 1978)........................................................................................23

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009).......................................................................................17, 39

*Fogel v. Vega*,
    759 F. App'x 18 (2d Cir. 2018) .................................................................................34

*Foley v. Transocean Ltd.*,
    861 F. Supp. 2d 197 (S.D.N.Y. 2012)................................................................25, 27

*Francisco v. Abengoa, S.A.*,
    No. 15 CIV. 6279 (ER), 2022 WL 3902852
    (S.D.N.Y. Aug. 30, 2022) ...........................................................................38

*Gross v. GFI Grp., Inc.*,
    784 F. App'x 27 (2d Cir. 2019) .................................................................. 37-38

*Hou Liu v. Intercept Pharms., Inc.*,
    No. 17-CV-7371 (LAK), 2020 WL 1489831
    (S.D.N.Y. Mar. 26, 2020) .........................................................................32

*In re Barrick Gold Corp. Sec. Litig.*,
    341 F. Supp. 3d 358 (S.D.N.Y. 2018)........................................................33

*In re Bristol-Myers Squibb Sec. Litig.*,
    312 F. Supp. 2d 549 (S.D.N.Y. 2004)..............................................15, 19, 27

*In re Garrett Motion Inc. Sec. Litig.*,
    No. 20 CIV 7992 (JPC), 2022 WL 976269
    (S.D.N.Y. Mar. 31, 2022) .........................................................................40

*In re Gen. Elec. Sec. Litig.*,
    844 F. App'x 385 (2d Cir. 2021) ...............................................................17

*In re Liberty Tax Inc. Sec. Litig.*,
    828 F. App'x 747 (2d Cir. 2020) ...............................................................37

*In re Lululemon Sec. Litig.*,
    14 F. Supp. 3d 553 (S.D.N.Y. 2014)..........................................................33

*In re Peabody Energy Corp. Sec. Litig.*,
    No. 20-CV-8024 (PKC), 2022 WL 671222
    (S.D.N.Y. Mar. 7, 2022) ...........................................................................37

*In re Pretium Res. Inc. Sec. Litig.*,
    No. 18 CIV 8199, 2020 WL 953609
    (S.D.N.Y. Feb. 27, 2020) ..........................................................................36

*In re Tommy Hilfiger, Sec. Litig.*,
  No. 04-cv-7678, 2007 WL 5581705
   (S.D.N.Y. July 20, 2007) ...................................................................................4

*In re Vale S.A. Sec. Litig.*,
  No. 19-CV-526 (RJD) (SJB), 2020 WL 2610979
   (E.D.N.Y. May 20, 2020) ...................................................................1, 34, 38

*Jackson v. Abernathy*,
  960 F.3d 94 (2d Cir. 2020).................................................................................32

*Khan v. Yale*,
  27 F.4th 805 (2d Cir. 2022) ................................................................................4

*Kleinman v. Elan Corp.*,
  706 F.3d 145 (2d Cir. 2013).........................................................................25, 35

*Lentell v. Merrill Lynch & Co.*,
  396 F.3d 161 (2d Cir. 2005)...............................................................................40

*Martin v. Quartermain*,
  732 F. App'x 37 (2d Cir. 2018) ...............................................................25, 35, 37

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015)....................................................................................35-36

*Ong v. Chipotle Mexican Grill, Inc.*,
  294 F. Supp. 3d 199 (S.D.N.Y. 2018)................................................................39

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004)................................................................................15

*Roth v. Jennings*,
  489 F.3d 499 (2d Cir. 2007).................................................................................3

*S.E.C. v. Monarch Funding Corp.*,
  192 F.3d 295 (2d Cir. 1999)...............................................................................15

*S.E.C. v. One or More Unknown Traders in Sec. of Onyx Pharm. Inc.*,
  296 F.R.D. 241 (S.D.N.Y. 2013) .......................................................................16

*S.E.C. v. Rio Tinto PLC*,
  41 F.4th 47 (2d Cir. 2022) ...........................................................................15, 40

*San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.*,
   75 F.3d 801 (2d Cir. 1996) ................................................................................ 18

*Shields v. Citytrust Bancorp, Inc.*,
   25 F.3d 1124 (2d Cir. 1994) ........................................................................ 23, 26

*Singh v. Cigna Corp.*,
   918 F.3d 57 (2d Cir. 2019) ................................................................................ 38

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Cap.*,
   531 F.3d 190 (2d Cir. 2008) .............................................................................. 30

*Thomas v. Shiloh Indus.*,
   No. 15 CV 7449 (KMW), 2017 WL 2937620
   (S.D.N.Y. July 7, 2017) ............................................................................... 30-31

*Tongue v. Sanofi*,
   816 F.3d 199 (2d Cir. 2016) ........................................................................ 35-36

*Town of Davie Police Officers Ret. Sys. v. City of N. Miami Beach Police Officers' &
   Firefighters' Ret. Plan*,
   No. 21-909-cv, 2021 WL 5142702
   (2d Cir. Nov. 5, 2021) ....................................................................................... 16

*Vansertima v. Dep't of Corr.*,
   No. 10 CV 3214 RJD RER, 2012 WL 4503412
   (E.D.N.Y. Sept. 28, 2012) ................................................................................. 19

*Villare v. Abiomed, Inc.*,
   No. 19 Civ. 7319 (ER), 2021 WL 4311749
   (S.D.N.Y. Sept. 21, 2021) ................................................................................. 32

*Wood v. Mut. Redevelopment Houses, Inc.*,
   No. 19 CIV 9563 (AT), 2021 WL 4255054
   (S.D.N.Y. Sept. 17, 2021) ................................................................................. 24

*Yany's Garden LLC v. City of New York*,
   No. 18CV2813NGGRML, 2020 WL 224701
   (E.D.N.Y. Jan. 15, 2020) .................................................................................. 13

**Federal Statutes**

15 U.S.C. § 78m(a) .................................................................................................. 15

15 U.S.C. § 78j(b) .................................................................................14, 15, 16

15 U.S.C. § 77q(a) ...................................................................................... 

passim

15 U.S.C. § 78m(a) .....................................................................................14, 15

**Other Authorities**

Fed. R. Civ. P. 8(a) .........................................................................................1, 29

Fed. R. Civ. P. 9(b) ...........................................................................1, 15, 19, 26

Fed. R. Civ. P. 12(b) ..........................................................................................1, 13

Fed. R. Evid. 201 .................................................................................................4

17 C.F.R § 240.10b-5 ...................................................................14, 15, 40

Defendant Vale S.A. ("Vale" or the "Company") respectfully submits this memorandum in support of its motion to dismiss with prejudice the complaint (ECF No. 1) (the "Complaint") filed by the U.S. Securities and Exchange Commission (the "SEC") for failure to state a claim pursuant to Federal Rules of Civil Procedure 8(a), 9(b) and 12(b)(6).[1]

## PRELIMINARY STATEMENT

The Complaint's fraud claims should be dismissed because they consist of conclusory and contradictory assertions that fail to raise a strong inference of scienter under the heightened pleading standard of Rule 9(b). Vale does not seek to relitigate the Court's previous rulings on the motion to dismiss in the related Class Action.[2] The allegations and circumstances here are fundamentally different and merit a different outcome. Unlike the Class Action plaintiffs, the SEC had the benefit of conducting a twenty-nine-month investigation *before* filing its Complaint, and reviewing multitudes of additional documents about Dam 1. As a result, the SEC relies on a significantly narrower theory of scienter than in the Class Action. And this narrower theory is not well pled because documents incorporated into the Complaint and public reports undercut any notion of a fraudulent scheme to mislead investors.

In contrast to the Complaint's conclusory assertions that Vale knew Dam 1 had an unacceptable risk of collapse, the very documents cited and relied on by the SEC in the Complaint concluded that Dam 1 appeared stable. This forecloses the SEC's allegations that the junior Vale personnel involved in the management of Dam 1's safety—the only employees the SEC even suggests might have scienter—knew, or were reckless in not knowing, that the dam was unstable. Similarly, although the SEC alleges, in a conclusory manner, that Vale schemed to

---

[1]    Unless indicated otherwise, all internal quotation marks and citations are omitted and all emphasis is added. Citations to "Ex." are to the exhibits attached to the Declarations of Jennifer Kennedy Park, filed herewith.
[2]    *See In re Vale S.A. Sec. Litig.*, No. 19-CV-526 (RJD) (SJB), 2020 WL 2610979 (E.D.N.Y. May 20, 2020) (the "Class Action").

hide critical facts about Dam 1 from external auditors, documents incorporated into the Complaint contradict these allegations: Vale disclosed the relevant information not only to these auditors but also to an independent, external group of leading international geotechnical experts. The external auditors and the independent geotechnical experts reviewed this information and, again, concluded that Dam 1 appeared stable. Vale's willingness to subject this data to the scrutiny of external auditors and experts entirely undermines any allegation that Vale fraudulently schemed to conceal the same. This type of contradictory pleading is insufficient as a matter of law.

As to the "critical facts" that Vale allegedly concealed, the SEC—with the benefit of hindsight—tries to portray an opinion by certain consultants (namely, that Vale should disregard laboratory data) as the only reasonable approach to calculating Dam 1's safety factor. That position ignores that this was just one opinion in a complex technical debate among external experts that remains unsettled. An external auditor's adoption of a reasonable technical opinion over another, however, cannot as a matter of law give rise to liability for fraud. In any case, the SEC does not allege that any senior executive or other individual whose scienter could be imputable to the Company as a whole (the only defendant in this action) had knowledge of the highly technical disagreements about the audits of one of Vale's hundred-plus dams. Rather, the SEC's fraud allegations are limited to the purported scienter of Vale's junior employees, whose scienter cannot be imputed to Vale as a matter of law.

In addition, the SEC alleges a number of misstatements and omissions that the Class Action plaintiffs deemed unworthy of inclusion in their complaint. These additional statements—such as Vale's subjective assessment that its 2016 audits represented "the vision of good practice in the world"—are inactionable statements of opinion, puffery, or otherwise not

false or misleading.  Finally, the SEC has not adequately pled that the disclosure of technical information such as Vale's auditors' use of laboratory data would have had a material impact on reasonable investors because no one—not the external auditors, not the independent geotechnical experts, not Vale management, and not those who assessed the dam's collapse—understood the dam to be at an unacceptably high risk or at a risk of imminent collapse.

## FACTUAL BACKGROUND

## I.    VALE'S OPERATIONS

Vale is a global leader in the production of iron ore, which has a multitude of uses in consumer and industrial products.  It is headquartered in Rio de Janeiro, Brazil, and employs over 130,000 people worldwide.  *See* 2017 Sustainability Report (Apr. 17, 2018), at 15, Ex. 1 (cited at Compl. ¶¶ 29, 30, 235, 237–38, 244, 254, 262–263).[3]  In 2017, Vale operated approximately 150 dams and dikes as part of its efforts to manage waste generated during the production of iron ore and other metals.  *See id.* at 67; Compl. ¶ 231.  Dam 1, whose failure is the subject of this lawsuit, was located near the city of Brumadinho, in the state of Minas Gerais, Brazil.  Compl. ¶ 4.  Dam 1 was a tailings dam (meaning that it stored a mining byproduct called "tailings") built in the 1970s and acquired by Vale in 2001.  *See* Post-Collapse Report (Dec. 12, 2019), at 16, Ex. 2; *id.*, App'x A at 1, Ex. 3 (cited at Compl. ¶ 5) (the "Post-Collapse Report").

Structures like Dam 1 present serious inherent risks, as Vale regularly disclosed.  For instance, Vale repeatedly warned investors that:

- "Our business is subject to a number of operational risks that may adversely affect our results of operations, such as . . . [a]ccidents or incidents involving our mines, industrial facilities and related infrastructure, such as dams."  Vale's 2017 20-F (Apr. 13, 2018), at 21–22, Ex. 4 (cited at Compl. ¶ 29); Vale's 2015 20-F, at 7 (March 31, 2016), Ex. 5;

---

[3]     On a motion to dismiss, a court may consider "documents attached to the complaint as exhibits or incorporated in it by reference," "matters of which judicial notice might be taken," and "documents either in plaintiff's possession or of which plaintiffs had knowledge and relied on in bringing suit."  *Roth v. Jennings*, 489 F.3d 499, 503 (2d Cir. 2007).

Vale's 2016 20-F (Apr. 10, 2017), at 7, Ex. 6 (cited at Compl. ¶¶ 29, 227); *see also* Vale's 2018 20-F (Apr. 18, 2019), at 28, Ex. 7 (cited at Compl. ¶ 29).[4]

- "[T]he mining industry is generally subject to significant risks and hazards, including . . . incidents involving dams, [and] failure of other operational structures . . . This could occur by accident or by breach of operating and maintenance standards, and could result in a significant environmental and social impacts, damage to or destruction of mineral properties or production facilities, personal injury, illness or death of employees, contractors or community members close to operations, environmental damage, delays in production, monetary losses and possible legal liability." Vale's 2017 20-F, at 24, Ex. 4; *see also* Vale's 2015 20-F, at 8, Ex. 5; Vale's 2016 20-F, at 9, Ex. 6; *see also* Vale's 2018 20-F, at 31, Ex. 7.

## II.    BACKGROUND OF AUDITS CONDUCTED ON DAM 1

### A. Regulatory Requirements For Dam Operators

In light of the inherent risks of operating dams, Brazil imposes a number of legislative and regulatory requirements on dam operators. This regulatory regime underwent significant changes after the November 2015 rupture of the Fundão dam – a then-active tailings dam owned and operated by Samarco Mineração S.A. ("Samarco"), in the Minas Gerais region near the city of Mariana, Brazil. *See* Compl. ¶ 7. These changes included the following requirements:

- **Extraordinary Audit:** In 2016, immediately after the failure of Fundão, the state of Minas Gerais required dam operators to execute a one-time, out-of-cycle (referred to as "extraordinary") audit on all upstream tailings dams, and further required reporting on the dam's tailings, monitoring systems, drainage systems, operational safety, and observed anomalies, among other relevant information (the "Extraordinary Audit"). *Id.* ¶ 8; Joint Resolution SEMAD/FEAM No. 2,372/2016 (May 6, 2016), Annex I, Ex. 8.[5] The Extraordinary Audit also required reporting on potential dam rupture mechanisms including liquefaction, which is "a condition in which saturated dam waste deposits spontaneously lose strength and stiffness, fundamentally compromising a dam's stability and dramatically increases the probability of collapse." Compl. ¶¶ 5–6.

- **Regular Dam Safety Inspections:** In 2017, Brazilian federal authorities issued an

---

[4]    The Court may consider "legally required public disclosure documents filed with the SEC" on a motion to dismiss. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

[5]    The Court may consider a foreign statute on a motion to dismiss pursuant to Federal Rule of Civil Procedure 44.1 as a relevant source to determine foreign law, and may also take judicial notice of a foreign statute under Federal Rule of Evidence 201, as it is not subject to reasonable dispute and can be determined from sources whose accuracy cannot reasonably be questioned. *See, e.g., In re Tommy Hilfiger, Sec. Litig.*, No. 04-cv-7678, 2007 WL 5581705, at *5 (S.D.N.Y. July 20, 2007) (admitting foreign statute under Rule 44.1) (internal citation omitted); *Khan v. Yale*, 27 F.4th 805, 813–14 (2d Cir. 2022) (taking judicial notice of out-of-state laws).

ordinance that expanded and codified reporting requirements for dam operators, and increased the frequency of routine audits known as "Regular Dam Safety Inspections" ("RISR") from annual to semi-annual (in March and September).  *Id.* ¶ 27; *see also* Ordinance No. 70,389/2017 (May 17, 2017), art. 2(35), art. 16(3), Ex. 9 (cited at Compl. ¶¶ 25, 27–28).  Since then, the requirements of the RISR include reporting on physical inspections of the dam and a stability analysis, among other things.

- **Periodic Dam Safety Review:**  The 2017 Brazilian federal ordinance also required a "Periodic Dam Safety Review" ("RPSB") to be filed every three years for certain dams.[6] The RPSB is "a more extensive and in-depth safety audit" than the RISR, and involves a thorough analysis of the dam's historical documentation, inspection reports, maintenance and operation procedures, hydraulic safety, and other factors.  *See* Compl. ¶ 27; *see also* Ordinance No. 70,389/2017, art. 13, Ex. 9.  As part of the RPSB, an auditor must do a stability analysis.  *See* Compl. ¶¶ 27–28.

Dam operators are required to hire external auditors to conduct these audits.  *See* Ordinance No. 70,389/2017, art. 16 § 1, Ex. 9; Joint Resolution SEMAD/FEAM No. 2,372/2016, Annex I, Ex. 8.  For each audit, the external auditor is required to issue a stability declaration ("DCE").  Compl. ¶ 8.  The DCE can only be "positive" (attesting that the dam is stable) or "negative" (attesting that it is not).  *See* Ordinance No. 70,389/2017, Annex III, Ex. 9.  Under Ordinance No. 70,389/2017, the decision to issue a positive or negative DCE is within the sole discretion of the external auditor.  *See id.* art. 2(15), art. 22, Annex III, Ex. 9.  If a dam receives a negative DCE, it has to suspend operations (*i.e.*, it has to stop receiving additional tailings) until it is determined to be stable again.  *See id.* art. 13 § 2.  Dam 1 had stopped receiving tailings in July 2016 for reasons unrelated to DCEs.  *See* Post-Collapse Report, at 21, Ex. 9.

## B.  Auditors Exercise Judgment In Calculating Safety Factors

When making stability evaluations and determining whether to issue a positive DCE for a dam, auditors perform and report on their holistic analysis, which includes a documentary

---

[6]     Under the Ordinance, dams with high "associated potential damage" need to submit RPSBs every three years.  Ordinance 70,389/2017, art. 15(a), Ex. 9.  "Associated potential damage" is defined as "[d]amage that may occur due to the rupture or malfunction of a dam, regardless of its probability of occurrence, to be scaled according to the loss of human life, social, economic and environmental impacts."  *Id.* art. 2(14).

review, visual inspections, and stability analyses based on field and laboratory data.  Compl. ¶ 32.  The analysis includes consideration of a dam's physical appearance, potential liquefaction triggers (*e.g.*, an earthquake), and monitoring data.  *See, e.g.*, Auditor C June 2018 RPSB (May 20, 2018), at 140–41, Ex. 13 (cited at Compl. ¶¶ 162–65, 170).[7]

One component of these stability analyses is the calculation of a "safety factor," which is a measure of the dam's <u>estimated</u> strength under various conditions, or a prediction as to the dam's <u>hypothetical</u> response to a liquefaction trigger.  *See, e.g.*, *id.* at 139–40; *see* Compl. ¶¶ 32–38.  As a baseline, a 1.0 safety factor represents a condition in which a dam's resistance strength is in equilibrium with destabilizing forces, meaning that a dam is estimated to carry the current stress load.  *See* Compl. ¶ 32.  Different safety factors can be calculated under: (1) the *drained condition*, which represents a dam with efficient, internal drainage and dissipated pore pressures; (2) the *undrained condition*, which represents a dam in which the water drains more slowly than the rate of loading; and (3) the *post-peak condition*, which represents a dam in a state of liquefied resistance after a trigger.  *See id.* ¶¶ 34, 38.  The SEC focuses on Dam 1's safety factor in the undrained condition, which is only one of the factors that must be analyzed to determine a dam's susceptibility to liquefaction, which in turn is only one data point in an auditor's holistic analysis.  *See, e.g.*, *id.* ¶¶ 79, 97, 137, 163, 182.

Calculating a safety factor involves significant technical judgment.  As reflected in each DCE identified by the SEC, safety factor calculations require an auditor's subjective assessment of various characteristics of dam materials (including soils and tailings) and the dam itself (including its water levels), based on a range of tests and geometric modeling, all of which are

---

[7]     For instance, Auditor C's June 2018 RPSB concluded that █████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████  Auditor C June 2018 RPSB, at 138–40, Ex. 13.

subject to significant degrees of variability.  *See, e.g.*, Auditor C June 2018 RPSB, at 80–108, Ex. 13 (cited at Compl. ¶¶ 162–65, 170).  There is no one accepted method to calculate a safety factor.  Rather, auditors have to decide which methodology and inputs to use,[8] and how to weigh those inputs.  For guidance on the calculation of safety factors, the Brazilian regulation at the time referred auditors to the Brazilian Association of Technical Norms ("ABNT"), a non-governmental entity that studies and recommends technical standards in Brazil.  *See* Ordinance No. 70,389/2017, Annex II, Ex. 9; Compl. ¶ 32.  While the ABNT recommended a 1.5 minimum safety factor for assessing the stability of tailings dams in the *drained* condition, it did not recommend a minimum safety factor for the *undrained* condition.  *See* ABNT Norm NBR 13,028 (2017), at 11–12, Ex. 10 (cited at Compl. ¶ 32).  The ABNT left the determination of the acceptable undrained safety factor to the discretion of the dam's external auditors, stating only that it must be "based on good engineering practices," *see id.* at 12, in part because a stability assessment is not a straightforward calculation, but a prediction that involves a significant degree of judgment.  In short, Brazilian law and guidance did not require a 1.3 minimum undrained safety factor for a tailings dam to receive a positive DCE.

## C. Vale Took Significant Steps Beyond The Regulatory Requirements To Enhance Its Dam Risk Management Practices

In addition to conducting the audits required by Brazilian regulations, Vale took significant steps to enhance its dam risk management practices following the Fundão rupture.

In 2016, Vale created the Geotechnical Risk Management ("GRG") group within its

---

[8]       *See, e.g.*, Compl. ¶¶ 36, 82 (citing Auditor A technical report that in uncited portion stated that ███████████████████ *id.* ¶¶ 86–87 (citing Auditor B audit report that in uncited portion stated that ███████████████████ ; *id.* ¶ 162 (citing Auditor C audit report that in uncited portion stated that ███████████████████

Ferrous Department.  The GRG was responsible for overseeing the activities of the operational group that managed Vale's dams day-to-day, and for implementing dam safety measures. Compl. ¶ 40.  In addition to undertaking internal reviews of its ferrous structures and geotechnical practices, Vale's Ferrous Department also sought the advice of external experts.  *Id*. ¶ 245.  The GRG retained external consultants to conduct hypothetical risk analyses known as Dam Rupture Probability studies to measure future risk probabilities posed by Vale's dams under various scenarios.  *Id*. ¶ 89; Monetized Risk Studies: Dam Rupture Probability Analysis (July 10, 2018), at 3, Ex. 14 (cited at Compl. ¶ 198).  These studies were distinct from the external audits required by Brazilian law, and did not measure dam stability; rather, they provided management with additional information to consider in evaluating the risk profile of Vale's dams.  Compl. ¶ 245.  The studies sought to establish the relative priority for improving the dams in Vale's portfolio by quantifying the risk that any one dam would rupture.  Report of the Second Meeting of the PIESEM (Dec. 20, 2017), at 18–19, 24, Ex. 15 (cited at Compl. ¶ 36).

In addition, in 2017, Vale commissioned the Independent Panel of Experts for Safety and Risk Management of Geotechnical Structures ("PIESEM") as an advisory panel to provide advice on Vale's efforts to enhance its risk management of dams.  Compl. ¶ 102.  This independent, external panel of renowned international and Brazilian experts (with specialties in geotechnical engineering, tailings dam management, hydraulic studies, and risk management) met regularly to review information about Vale's dams and discuss Vale's dam management practices.  *See id.*; Report of the Second Meeting of the PIESEM, at 1–3, Ex. 15.

## III.    AUDITORS CERTIFIED DAM 1 AS STABLE BETWEEN 2016 AND 2018

As relevant here, from 2016 through 2018, Dam 1 underwent the following audits: (1) the Extraordinary Audit in 2016; (2) an RISR audit in September 2017; (3) an RISR audit in March

2018; (4) the RPSB audit in June 2018; and (5) an RISR audit in September 2018.  Compl. ¶ 8.

The PIESEM also assessed Dam 1 in November 2017 and October 2018.  *See, e.g.*, *id*. ¶¶ 36,

196.  As discussed below, at the end of each audit, the independent external auditors issued

positive DCEs for Dam 1, attesting that the dam was stable, *see* Ordinance No. 70,389/2017,

Annex III, Ex. 9, and by extension did not present an "unacceptable risk of failure."

    *2016 Extraordinary Audit*.  Vale retained Auditor A to conduct the 2016 Extraordinary

Audit for Dam 1 and other structures.  Compl. ¶ 49.  Auditor A, in turn, subcontracted a

geotechnical expert to act as a consultant and provide advice in connection with the required

liquefaction analyses (the "Consultant").  *Id*.  As part of his contract with Auditor A, that

Consultant physically inspected Dam 1 and reviewed results of both "Field Tests" conducted on

the dam itself and "Lab Tests" conducted on field samples brought to a laboratory.  *Id.* ¶ 57.  The

Consultant expressed his view that the Lab Tests should be conducted on reconstituted field

samples (*i.e.*, samples extracted from the field and manipulated in a laboratory to resemble field

conditions) rather than undisturbed field samples (*i.e.*, field samples that are transported and

analyzed in a laboratory in substantially the same form as they were extracted).  *Id.* ¶ 58;

Consultant's Memorandum (July 20, 2016) at 5, Ex. 16 (cited at Compl. ¶¶ 73–74, 87, 96).

Agreeing with this view, Auditor A only used Lab Tests performed on reconstituted field

samples when it conducted the liquefaction analysis for Dam 1.

    After reviewing the Lab Tests for Dam 1, the Consultant also ███████████ found that

the results of only one series of Lab Tests on reconstituted samples seemed to be representative

of Dam 1's tailings; in his opinion, the other Lab Tests were unrepresentative, and therefore

unreliable, and should not be used in Dam 1's stability analysis.  *See* Consultant's Memorandum,

at 16, 19, Ex. 16.  Auditor A disagreed, and decided it was more appropriate to use all of the Lab

Tests that were done using reconstituted field samples, but weighted those Lab Tests less than the Field Tests, at the ratio of one-third to two-thirds. *See* Auditor A Extraordinary Audit Report (Aug. 30, 2016), at 25–26, Ex. 17 (cited at Compl. ¶¶ 36, 78-79, 81). Based on this judgment, Auditor A calculated an undrained safety factor of 1.3. *Id*. at 28. Then, taking into account that calculated safety factor, a 1.6 safety factor in the drained condition, as well as the likelihood of potential triggers, visual inspections and review of instrumentation data, Auditor A determined that Dam 1 was stable, and issued a positive DCE for Dam 1. *Id*. at 29; Compl. ¶ 47.

*September 2017 and March 2018 RISR Audits*. In February 2017, Vale retained Auditor B to conduct the Dam 1 RISR audits for September 2017, March 2018, and September 2018. *See id.* ¶ 84. Auditor B conducted the first two audits, and in each case determined that in its judgment Dam 1 was stable and issued positive DCEs. Vale provided Auditor B with the Lab Tests for Dam 1 as well as dozens of Dam 1-specific audit and technical reports. Critically, Vale specifically provided Auditor B with documents showing what methodology Auditor A had used to calculate the safety factor for Dam 1's undrained condition (*i.e.*, weighting Field Tests twice as heavily as Lab Tests) and documents that contained Auditor A's Consultant's opinions regarding the usefulness of the Lab Tests. *See* Auditor B September 2017 RISR (Sept. 13, 2017), at 37, 39–40, 46, Ex. 18 (cited at Compl. ¶ 97) (citing Auditor A Liquefaction Studies Report (Dec. 20, 2016), at 2–4, Ex. 19). After reviewing these materials, Auditor B independently decided to follow Auditor A's weighting methodology, and calculated a 1.3 safety factor for Dam 1's undrained condition. *See id.* at 35, 39–40. Auditor B issued a positive DCE for Dam 1 for the September 2017 and March 2018 RISRs.

*June 2018 RPSB Audit*. In July 2017, Vale retained Auditor C to conduct the June 2018 RPSB for Dam 1. Entirely separately but at the same time, Vale also retained Auditor C and

Engineering Firm One to jointly conduct Dam Rupture Probability studies at several dams, including Dam 1.  Compl. ¶ 100.  For the Dam Rupture Probability study of Dam 1, Auditor C and Engineering Firm One conducted a stability analysis and, after analyzing the Lab Tests for Dam 1, decided not to use any of them in their stability analysis and calculated a safety factor of 1.06 in the undrained condition.  *Id.*  They delivered the final Dam Rupture Probability analysis, containing that safety factor, to Vale in July 2018.  *See* Monetized Risk Studies: Dam Rupture Probability Analysis, Ex. 14 (cited at Compl. ¶ 198).

After receiving the Dam Rupture Probability Study, Vale questioned why Auditor C had not used the Lab Tests for the Dam Rupture Probability analysis and whether the Lab Tests would be used for the stability analysis in connection with the DCE, as Auditors A and B had done.  Auditor C told Vale that it believed the Lab Tests were unrepresentative and thus would not take them into account.  Compl. ¶ 126.  Upon further analysis, but without using the Lab Tests, Auditor C recalculated the undrained safety factor to be 1.09.  *Id.* ¶ 162.

While these discussions were ongoing, Auditor C's employees speculated internally as to whether they might receive pressure from Vale to timely issue a DCE for Dam 1 in connection with the June 2018 RPSB, particularly as bidding for another contract with Vale was ongoing.  *Id.* ¶¶ 150, 154.  Auditor C won that contract well before it issued the DCE for Dam 1.  *Id.* ¶ 160.  Subsequently, Auditor C requested that Vale provide evidence of the adoption of certain measures to improve Dam 1's condition.  *Id.* ¶ 161.  After Vale provided the documents—and based on its interpretation of instrumentation data, field inspections, the stability analysis and other factors—Auditor C determined that Dam 1 was stable and issued a positive DCE for the June 2018 RPSB.  *See* Auditor C June 2018 RPSB, Ex. 13; Compl. ¶ 174.

*September 2018 RISR Audit.*  Around the same time as the issuance of the June 2018

RPSB, Auditor B, which was tasked with conducting the September 2018 RISR audit, communicated to Vale that it might not be able to complete the audit by the regulatory deadline. *See, e.g.*, Compl. ¶ 182.  Concerned with meeting the deadline, Vale's GRG personnel decided to transfer the responsibility for the September 2018 RISR audit from Auditor B to Auditor C, *see id*. ¶ 183, given that Auditor C had just finished a comprehensive review of Dam 1 in the context of the RPSB, and had a wealth of readily available information about the dam.  *See, e.g.*, Auditor C June 2018 RPSB, Ex. 13; Monetized Risk Studies: Dam Break Study (May 20, 2018), Ex. 20 (cited at Compl. ¶¶ 166-68).  Auditor B agreed with this transfer.  *See, e.g.*, Compl. ¶¶ 182–86. Auditor C then conducted the RISR and, based on its review of the data, including the calculated safety factor of 1.09 in the undrained condition, determined again that Dam 1 was stable, and issued a positive DCE in September 2018.  *Id.* ¶ 188.

*PIESEM Review*.  Around this time, the PIESEM was meeting at regular intervals to review Vale's dam safety practices and advise on the Company's operational risk management. GRG personnel "set the agenda for the PIESEM meetings, arranged for Vale's auditors to make presentations about the liquefaction analyses" being performed, and "otherwise attended and participated in the meetings."  *Id.* ¶ 102.

Significantly, Vale's GRG personnel chose to discuss Dam 1 as a case study at two PIESEM meetings, in November 2017 and October 2018, that were also attended by representatives of Auditors A, B, and C.  *See* Report of the Second Meeting of the PIESEM, at 2, 10, Ex. 15 (cited at Compl. ¶ 36); Report of the Third Meeting of the PIESEM (Oct. 17, 2018), at 2, Ex. 21 (cited at Compl. ¶¶ 196, 203).[9]  At these meetings, Engineering Firm One and Auditor

---

[9]    The SEC failed to cite relevant parts of the Third PIESEM report, despite (1) elaborating on presentations and discussions at the Third PIESEM, Compl. ¶¶ 203–05, as part of its claims, and (2) citing to the previous panel report, *id.* ¶¶ 107, 116.  The Third PIESEM report further speaks directly to information disclosed, at Vale's request, to external experts and Vale's other auditors regarding the 1.09 safety factor calculated for Dam 1, the dam's water

C gave detailed presentations about the stability analyses conducted for Dam 1's Dam Rupture Probability study and the June 2018 RPSB. *See id.* ¶ 103; *see also* Report of the Third Meeting of the PIESEM, at 20–24, Ex. 21. At these meetings, Engineering Firm One and Auditor C expressed their view that the Lab Tests for Dam 1 should be disregarded, and that the dam's undrained safety factor without considering the Lab Tests was 1.06 or "on the order of 1.1." Engineering Firm One's PIESEM Presentation (Nov. 16, 2017), at 65, Ex. 24 (cited at Compl. ¶ 103); Report of the Third Meeting of the PIESEM, at 20, Ex. 21.

After reviewing the information presented by Vale and the auditors, and physically visiting the dam, the PIESEM concluded that Dam 1 had  Report of the Third Meeting of the PIESEM, at 20. The PIESEM also concluded that further study of Dam 1 should be done, but did not recommend that any immediate stability measures be taken: aside from work to reduce the dam's water level, there should be *Id.* at

22. The PIESEM's conclusions were consistent with Auditor A, B, and C's findings that Dam 1 appeared to be stable, and not at heightened risk of collapse.

## IV.   DAM 1 RUPTURED WITHOUT ANY SIGNS OF DISTRESS

Dam 1 ruptured on January 25, 2019. According to an independent panel of geotechnical experts who investigated the technical causes of the failure (the "Post-Collapse Panel"), Dam 1

---

levels, and other notes about its condition that strike at the heart of the SEC's allegations of fraudulently produced DCEs. The SEC's "failure to include matters of which as pleader[ ] [it] had notice and which were integral to [its] claim . . . may not serve as a means of forestalling the district court's decision on a 12(b)(6) motion." *Yany's Garden LLC v. City of New York*, No. 18CV2813NGGRML, 2020 WL 224701, at *3 (E.D.N.Y. Jan. 15, 2020) (quoting *L–7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011)).

collapsed due to liquefaction.  Compl. ¶ 5.  "Liquefaction typically requires a triggering event, such as an earthquake, vibrations from heavy equipment, or even heavy rainfall, but it can also be triggered incrementally through a process known as 'creep,' . . . or the 'accumulation of strain under constant load.'"  *Id.*  The Post-Collapse Report concluded that Dam 1 collapsed due to liquefaction triggered by creep.  *Id.*  The panel also found that the collapse was "unique in that it occurred with no apparent signs of distress prior to failure."  *See* Post-Collapse Report, at i, Ex. 2.  The dam did not exhibit any cracking or deformations, which are the typical signs of a potential collapse.  *See id.* at i.  As the panel explained, "if the [safety factor] was very close to 1.0, the dam would be expected to show various signs of distress, such as cracking and deformations, because the materials must strain (deform) to reach their peak strength."  *See id.* at 60.  No such signs were present at Dam 1, and even a "[h]igh quality video from a drone flown over Dam I only seven days prior to the failure . . . showed no signs of distress."  *See id.* at i.

The Post-Collapse Panel re-reviewed all the data that was collected and analyzed by Vale employees during routine monitoring and maintenance of Dam 1 and concluded that "[n]one of these methods detected any significant deformations or changes prior to failure."  *Id.*

## V.   VALE'S POST-COLLAPSE REMEDIAL STEPS AND THIS ACTION

Vale's response to Dam 1's collapse was immediate and extensive.  By the end of 2019, Vale had entered into 27 agreements with authorities to conduct reparation and remediation efforts.  *See* Vale's 2019 20-F, at 3, Ex. 11.  In November 2019, almost a year after Dam 1's collapse, the SEC began an investigation into Vale's actions ahead of the dam failure.  The SEC now asserts claims under Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, Section 17(a) of the Securities Act, and Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-16 thereunder.  These claims are largely based on the theory that Dam 1 should not have

received positive DCEs because, in the SEC's hindsight-based opinion, Vale's auditors used the wrong methodology and data to calculate the safety factor used in those DCEs.

## STANDARD OF REVIEW

"To survive a motion to dismiss," a complaint must contain "sufficient factual matter . . . to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In making this assessment, the Court "need not accept as true an allegation that is contradicted by documents on which the complaint relies." *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 555 (S.D.N.Y. 2004). Fraud allegations must also satisfy the heightened pleading standard of Rule 9(b), which requires the SEC to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b); *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004) (fraud claims subject to Rule 9(b) even where scienter is not an element).

A violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder, as well as Section 17(a)(1) of the Securities Act, require that a defendant have "(1) made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities." *S.E.C. v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999). So-called "scheme liability" under Rule 10b-5(a) and (c) requires not only the elements of a Rule 10b-5(b) violation (including scienter) but also "something beyond misstatements and omissions" in connection with the purchase or sale of a security. *S.E.C. v. Rio Tinto PLC*, 41 F.4th 47, 54 (2d Cir. 2022). Violations of Section 17(a)(2)-(3) of the Securities Act require "essentially the same elements," except that a showing of scienter is not necessary. *Id.* Section 13(a) of the Exchange Act similarly does not require scienter. *See* 15 U.S.C. § 78m(a).

## ARGUMENT

The Complaint fails as a matter of law. *First*, the Complaint does not give rise to a strong inference of scienter, as the SEC fails to plead particularized facts in support of its theory, that theory is contradicted by its own allegations and documents incorporated into the Complaint that support inferences consistent with innocent conduct, and the Complaint does not allege scienter imputable to Vale. *Second*, the new alleged misstatements are inactionable statements of opinion or puffery. *Third*, no alleged omissions from Vale's disclosures were material in light of the disclosure of Vale's genuinely-held belief that Dam 1 was stable. *Finally*, the SEC's allegations of scheme liability fail to allege fraud beyond the alleged misstatements or omissions.

## I.    THE COMPLAINT FAILS TO ALLEGE A STRONG INFERENCE OF SCIENTER

To adequately plead violations of Section 10(b) and Section 17(a)(1), a plaintiff must allege facts giving rise to a "strong inference" of scienter. *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 52 (2d Cir. 1995); *S.E.C. v. One or More Unknown Traders in Sec. of Onyx Pharm. Inc.*, 296 F.R.D. 241, 249 n. 4 (S.D.N.Y. 2013) (applying pre-PSLRA Second Circuit "strong inference" standard in SEC case). This can be established either "(1) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (2) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Acito*, 47 F.3d at 52. Motive and opportunity require that the Company or its officers "benefitted in some concrete and personal way from the purported fraud"—"the desire for the corporation to appear profitable" or "to keep stock prices high to increase officer compensation" is not enough. *Town of Davie Police Officers Ret. Sys. v. City of N. Miami Beach Police Officers' & Firefighters' Ret. Plan*, No. 21-909-cv, 2021 WL 5142702, at *2 (2d Cir. Nov. 5, 2021). In the absence of a showing of motive, "the strength of the circumstantial allegations must be correspondingly greater." *Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 355 (2d Cir.

-16-

2022).  To establish recklessness, a plaintiff must show "highly unreasonable" conduct representing "an extreme departure from the standards of ordinary care" that "approximat[es] actual intent."  *In re Gen. Elec. Sec. Litig.*, 844 F. App'x 385, 388 (2d Cir. 2021).

Here, the SEC fails to plead any motive or opportunity to commit fraud, and rests its theory of scienter on the narrow, circumstantial assertions that junior Vale employees (1) knew that Dam 1 was unstable based on its safety factor and the results of certain probabilistic studies, *see, e.g.*, Compl. ¶¶ 45, 46, 78, 79, 191, 194, 198, 221; (2) hid a single data point from Dam 1's auditors, *see, e.g.*, *id.* ¶¶ 85, 95, 96, 99, 101; and (3) removed or "pressured" auditors because they allegedly might not issue a positive DCE for Dam 1, *see, e.g.*, *id.* ¶¶ 15, 135, 142, 157, 159, 160, 182–88, 242.  None of these assertions are sufficient to raise a strong inference of scienter.  Moreover, these assertions are based on the alleged knowledge of junior Vale employees whose mental state cannot be imputed to Vale.  *Barrett v. PJT Partners Inc.*, No. 16-CV-2841 (VEC), 2017 WL 3995606, at *7 (S.D.N.Y. Sept. 8, 2017) (Whether an employee's scienter is imputable to a corporation "depends on whether [the employee] was a sufficiently senior officer at the company," and "the connection between the [employee's] role and the fraudulent statements.").

## A.  The SEC Does Not Adequately Allege Motive And Opportunity

The Complaint is devoid of any well-pled allegations that Vale had a motive to benefit from the alleged misstatements.  For instance, there is no allegation that any Vale employee involved in the alleged misstatements tried to profit off of the alleged fraud (for example, through stock sales) or otherwise had anything but a permissible motive "common to most corporate officers."  *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009).  There is also no allegation that Vale itself had motive and opportunity to defraud, other than issuing securities, Compl. ¶ 273–74, "high reputational

and economic costs," *id.* ¶ 13, and "significant out-of-pocket expenses . . . [and] reduced output

from the Córrego do Feijão mine," *id.* ¶ 275.  These allegations constitute at most "a general

profit motive common to all corporations," which "does not suffice to allege fraudulent intent."

*Dash v. Seagate Tech. (US) Holdings, Inc.*, No. CV 13–6329, 2015 WL 1537543, at *2

(E.D.N.Y. Apr. 1, 2015); *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip

Morris Cos., Inc.*, 75 F.3d 801, 813 (2d Cir. 1996) (inflated stock price to maintain bond or credit

ratings to maximize marketability of debt securities was an insufficient profit motive).  Nor

could there be any such motive given that Dam 1 had been inactive since 2016 and had no

impact on Vale's mining operations.  Accordingly, the SEC has failed to allege motive and

opportunity, and "the strength of [its] circumstantial allegations must be correspondingly

greater."  *See Ark. Pub. Emps. Ret. Sys.*, 28 F.4th at 355.

### B. The SEC Fails To Adequately Plead Circumstantial Evidence That Vale Knew Or Recklessly Disregarded That Dam 1 Was Unstable

The SEC's circumstantial allegations of scienter revolve around (1) the supposed

"knowledge" of junior Vale personnel of Dam 1's purported "low safety factors" and

"unacceptable" probability of failure, Compl. ¶¶ 46, 191; (2) knowledge that Auditors A and B

relied on Lab Tests that Auditor A's Consultant had considered unreliable, *id.* ¶¶ 48, 58, 70–75,

79; (3) alleged "deliberate concealment" of certain information from Auditor B, *id.* ¶¶ 98, 99;

(4) supposed "pressure" of certain junior employees on Auditor C, *id.* ¶¶ 142, 157, 160; and

(5) the replacement of Auditor B for the September 2018 RISR, *id.* ¶¶ 135, 142.  However, the

SEC does not point to even one particularized fact demonstrating that anyone at Vale—let alone

the employees discussed in the Complaint, who regularly visited the dam and worked near it—

believed Dam 1 should not have received a DCE.  Conclusory assertions that individuals "knew"

of an unacceptable risk of failure, devoid of particularized support, are insufficient to satisfy

Rule 9(b).  *See ATSI*, 493 F.3d at 99.

### 1.  Documents Incorporated In The Complaint Show That Dam 1 Appeared Stable

The SEC's failure to cite any particularized facts in support of its conclusory assertions is

no accident:  The independent reports incorporated by reference in the Complaint—including

audit reports (cited at Compl. ¶¶ 36, 78, 79, 81, 86–87, 93, 97, 132, 136, 137, 162–65, 170), the

Post-Collapse Report (cited at Compl. ¶ 5), and PIESEM reports (cited at Compl. ¶¶ 36, 196,

203–05)[10]—uniformly make clear that Dam 1 appeared stable until its collapse and thus was not

believed to have an unacceptable probability of failure.  The SEC cannot substitute its own

conclusory interpretation of highly technical information to allege recklessness, particularly in

the face of contemporaneous documents (upon which they rely) that say otherwise.  The SEC

must accept as true the entirety of the documents it relies upon and may not cherry-pick from

them to satisfy Rule 9(b).  *Bristol-Myers Squibb*, 312 F. Supp. 2d at 555; *Vansertima*, 2012 WL

4503412, at *2 n.2.  When the sources cited in the Complaint are reviewed in their entirety, they

defeat any inference of scienter.

*First*, the Complaint fails to acknowledge that the cited Post-Collapse Report found that

Dam 1's collapse was "unique in that it occurred with no apparent signs of distress prior to

failure."  *See* Post-Collapse Report, at i, Ex. 2.  As that Report explains, before Dam 1's rupture,

external auditors and Vale's operational employees regularly observed and evaluated the

conditions at Dam 1 using a number of monitoring devices.  *Id.*  These devices tracked

precipitation, air temperature, humidity, atmospheric pressure, wind speed and direction, surface

water elevation in the dam's tailings, groundwater levels, water pressure, free water levels in the

---

[10]      Vale produced the reports during the SEC's investigation and the SEC incorporated them by reference in
the Complaint.  *See Vansertima v. Dep't of Corr.*, No. 10 CV 3214 RJD RER, 2012 WL 4503412, at *4 (E.D.N.Y.
Sept. 28, 2012) (Dearie, J.) ("[T]he complaint is deemed to include any written instrument attached to it as an
exhibit or any statements or documents incorporated in it by reference.").

dam's embankment and tailings, water flow at various points across the dam, the slope of the dam, seismic activity near the dam, and dam deformations. *Id.*, App'x C, at 1–14, Ex. 12. The Post-Collapse Panel analyzed all of this data, and concluded that "[n]one of these methods detected any significant deformations or changes prior to failure," even in "[h]igh quality video from a drone flown over Dam 1 only seven days prior to the failure." *Id.* at i, Ex. 2. These conclusions entirely undermine the Complaint's allegation that Vale was reckless in failing to disclose that Dam 1 had a "known," unacceptably high risk of failure before the collapse.

*Second*, the Complaint discusses aspects of the PIESEM meetings but fails to acknowledge the PIESEM's relevant conclusions regarding Dam 1 from those meetings. The PIESEM reviewed relevant information about Dam 1 in November 2017 and October 2018, and none of the experts on the panel expressed the view that Dam 1 was not stable. In fact, in portions of their reports that the Complaint omits, the PIESEM concluded the exact opposite, noting that Dam 1 had ███████████████████████ and recommending *against* any immediate action at the dam. Report of the Third PIESEM Meeting (Oct. 17, 2018), at 20, 24, Ex. 21 ███████████████████████████████

███████████████████████████████████████ aside from work to reduce the dam's water level, there should be ███ ███████████████████████

█████████████████████████████████████). The PIESEM's conclusions were made with their full knowledge of the safety factor and Lab Tests that the SEC alleges demonstrate Vale's knowledge of Dam 1's alleged instability. *See supra* Factual Background III. The SEC's allegation of scienter, therefore, rests on the absurd premise that Vale was reckless for accepting the analyses of the world's leading geotechnical experts.

*Third*, the Complaint fails to acknowledge that the external auditors found Dam 1 to be

stable, based on using multiple considerations, not just the undrained safety factor.  As the legislation and audit reports make clear, an auditor cannot rely solely on an undrained safety factor value to determine whether a dam is stable.  *See, e.g.*, Ordinance No. 70,389/2017, Annex II, Ex. 9 (listing as requirements of the RPSB "[r]esult of detailed and adequate inspection of the dam site and its associated structures," "[u]pdating [] the hydrological studies and series and comparison of these studies with the capacity of the existing spillage devices," and "[r]eassessment of operating, maintenance, testing, instrumentation and monitoring procedures," among others); Auditor C June 2018 RPSB, Ex. 13 (discussing detailed results of dam performance analysis, observations from field visit, and hydraulic safety assessment, among others).  While the Complaint alleges that the audit reports' safety factor calculations were based on unreliable Lab Tests, *see, e.g.*, Compl. ¶¶ 48, 85, there are no allegations that any other modes of analysis (that did not rely on Lab Tests) in the audit reports were inaccurate or unreliable.  For example, Dam 1's safety factor in the drained condition (1.6) exceeded the required minimum under ABNT standards.  *See, e.g.*, Auditor C June 2018 RPSB (May 20, 2018), at 102, 139, Ex. 13.

Further, several different auditors who examined Dam 1 throughout the relevant period concluded that even if Dam 1's undrained safety factor was "low," as the SEC alleges, the odds of the dam failing due to liquefaction were "remote."  *See, e.g.*, Auditor B September 2017 RISR, at 43, Ex. 18; Auditor A July 2016 Liquefaction Study (July 15, 2016), at 10, Ex. 22 (cited at Compl. ¶¶ 69–72).  These same reports state that as a matter of basic physics Dam 1 was becoming safer over time because it had been shut down since 2016, the pond behind the solid part of Dam 1 had been drained, and the internal water levels were dropping.  *See* Post-Collapse Report, at 21, 62, Ex. 2; Report of Third PIESEM Meeting, at 20, Ex. 21; Auditor C June 2018

RPSB, at 72, Ex. 13).  Whether the calculated safety factor was 1.3 or 1.09, the dam was more stable than it had been before 2016, and any risks were lessening.  Therefore, the Complaint's allegation that Vale was reckless in not disclosing the "heightened" risks of Dam 1 is contradicted by the very documents upon which it relies, and thus fails as a matter of law.

*Fourth*, the Complaint's references to Dam 1's probabilistic studies suffer from similar incompleteness.  At the time that Dam 1 collapsed, Vale was in the middle of developing a new risk-management methodology focused on probabilistic assessments.  *See supra* Factual Background II.C.  This methodology was discussed with the PIESEM, and was an initiative that went beyond the stability analyses required by law.  According to these probabilistic studies, the annual probability of failure for Dam 1 was 2 in 10,000 with respect to internal erosion, Compl. ¶ 194, and 3 in 10,000 with respect to liquefaction, *id.* ¶ 198.  Based on this analysis, Dam 1 was in the middle category of a report that contained three zones: "Maintenance and Control," "Attention Zone/ALARP," and "Immediate Treatment."  *See* GRG – Geotechnical Risk Management Results (Oct. 3, 2018), at 16, Ex. 23 (cited at Compl. ¶ 203).

The SEC conclusorily alleges that the dam's inclusion in the "Attention Zone" means that Dam 1's risk of failure was "unacceptable."  Compl. ¶ 191.  But those are simply apples and oranges:  inclusion in the "Attention Zone" based on probabilistic studies has nothing to do with whether the DCEs issued for Dam 1 were false.  Probabilistic studies aim to estimate the probability of collapse based on even the most remote possibilities, whereas DCEs aim to analyze whether a dam is *currently* stable, based on presently existing factors and measurements.  *See supra* Factual Background II.C.  That Dam 1 had a possibility of collapse of 3 in 10,000 per year is not an indicator that the dam was currently unstable.  And the Complaint does not allege that anyone at Vale ever connected the two in the way the Complaint implies.  In fact, Auditor C

-22-

worked on both the RPSB and the probabilistic studies around the same time, *see* Comp. ¶ 146, and the Complaint contains no allegations that Auditor C believed the probabilistic studies meant Dam 1 was unstable or did not deserve a DCE.  In fact, the Complaint neglects to mention (but the documents it cites show) that the "Immediate Treatment Zone"—not the "Attention Zone/ALARP"—was the zone that reflected risks requiring immediate action.  *See* GRG – Geotechnical Risk Management Results, at 16, Ex. 23.  Thus, these probabilistic analyses showed Vale exactly what the PIESEM and the auditors had concluded—that Dam 1 was not in need of immediate action.  *See*

In sum, the contemporaneous assessment of Dam 1 by independent geotechnical experts led to the universal conclusion that it appeared to be stable and thus was not at an unacceptably high risk of collapse.  This conclusion was repeatedly conveyed to Vale personnel in documents upon which the Complaint relies.  The Complaint thus fails not only because it provides no particularized facts in support of its conclusory assertion that Vale "knew" there was an unacceptable risk of collapse, but also because the materials incorporated by reference into the Complaint make clear that Vale personnel could not have been reckless in failing to disclose a risk that some of the world's leading geotechnicians did not believe existed.  The unfortunate reality that no one had the "clairvoyance" to predict this unforeseeable disaster does not save the Complaint.  *See Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978).

## 2. The SEC Does Not Adequately Allege That Vale Concealed Information From Or Improperly Pressured Auditors And Experts

The SEC's additional scienter allegations that junior Vale employees "concealed" Dam 1's true condition from an external auditor assessing the dam or pressured another auditor to certify Dam 1 as stable are insufficient as a matter of law.  *See, e.g.*, Compl. ¶¶ 98, 99.  The Complaint again fails to allege particularized facts in support of these conclusory assertions, and

documents incorporated in the Complaint reflect that the Company disclosed all relevant information about the dam to each of these auditors as well as other independent geotechnical experts.  These voluntary disclosures to auditors, consultants, and experts all contradict the SEC's allegations that Vale schemed to conceal information concerning the dam's condition. *See Wood v. Mut. Redevelopment Houses, Inc.*, No. 19 CIV. 9563 (AT), 2021 WL 4255054, at *4 (S.D.N.Y. Sept. 17, 2021) ("[T]he Court need not accept as true an allegation that is contradicted by documents on which the complaint relies.").

### a. The Complaint Does Not Allege That Vale Played Any Role In Auditor A's Decision To Consider The Relevant Lab Data

The Complaint baldly alleges that "Vale knew, or was reckless in not knowing, that [the two DCEs issued by Auditor A] were based on flawed and unreliable laboratory data," despite a recommendation from a Consultant hired by Auditor A not to use the Lab Tests.  Compl. ¶¶ 48, 58, 70–75, 79.  But the Complaint fails to allege any particularized facts that Vale (or even Auditor A) did not genuinely believe that Auditor A's results or methodology were valid.  As before, the failure to allege such facts is fatal to the SEC's fraud claims.  *ATSI*, 493 F.3d at 99.

Moreover, under Brazilian law, Auditor A had complete discretion to decide how to conduct its liquefaction analysis and whether to declare the dam stable, based on its own expertise and informed judgment.  *See* Joint Resolution SEMAD/FEAM No. 2,372/2016, Annex I, Ex. 8.  In an exercise of its own judgment, Auditor A declined to follow the recommendation of its Consultant regarding the Lab Tests, *see* Auditor A Extraordinary Audit Report, Ex. 17, and there are no plausible allegations that the decision was influenced in any way by Vale.  Instead, at most, the SEC alleges that Auditor A disagreed with the opinion of its Consultant, that Vale was aware of this, and that Vale relied on the conclusions of its auditor following this disagreement among geotechnical experts.  These types of allegations—which reflect good-faith

-24-

differences of opinion among experts offering a "competing analysis or interpretation of data" on highly technical decisions  requiring complex judgments—fail to establish fraud as a matter of law.  *Kleinman v. Elan Corp.*, 706 F.3d 145, 154 (2d Cir. 2013); *see also, e.g.*, *Martin v. Quartermain*, 732 F. App'x 37, 41 (2d Cir. 2018) ("Plaintiffs' allegations . . . [do] little more than [raise] a dispute about the proper interpretation of data, a dispute this Court [has] rejected as a basis for liability.").  The SEC's allegations cannot form a basis for fraud here, where the SEC impliedly asserts that Vale *should have* persuaded one auditor (Auditor A) to adopt a particular methodology, and *should not have* done the same with respect to a different auditor (Auditor C). *See supra* Argument I.B.2.a, c.  The SEC cannot have it both ways.  In any case, the Complaint does not allege that Vale did anything to persuade Auditor A to use the Lab Tests or that Vale believed the safety factor was wrong.

Since the SEC alleges no improper interference with Auditor A's audit, Vale's good-faith reliance on the audit precludes a strong inference of scienter.  *See Foley v. Transocean Ltd.*, 861 F. Supp. 2d 197, 212 (S.D.N.Y. 2012) ("Given the certifications that the rig was in safe working condition . . . just several weeks before the accident, Lead Plaintiff has not provided a plausible reason to believe that [defendant possessed scienter].").

**b.  The Complaint Does Not Adequately Allege That Vale Withheld Information From Auditor B, And Incorporated Documents Show It Did Not**

The SEC next alleges that Vale fraudulently obtained DCEs in September 2017 and March 2018 by deliberately withholding from Auditor B the facts that (1) Auditor A's Consultant had recommended not to use the Lab Tests for Dam 1, Compl. ¶¶ 95–96; and (2) Engineering Firm One and Auditor C disagreed with Auditor A's decision to include the Lab Tests in its liquefaction analysis of Dam 1, *id.* ¶ 91.  These assertions fail for multiple reasons.

*First*, these allegations are entirely conclusory:  despite its years-long investigation, the

-25-

Complaint fails to allege the who, what, when, where and why of Vale's alleged "concealment." *See e.g.*, *id.* ¶¶ 94–96, 101, 108, 112, 115–16, 125, 128, 130; *Shields*, 25 F.3d at 1129 ("conclusory allegations – that Defendants 'knew but concealed' some things, or 'knew or were reckless in not knowing' other things – do not satisfy the requirements of Rule 9(b).").

*Second*, the Complaint's allegations are contradicted by documents that are integral to the Complaint. The Complaint asserts without factual support that Auditor B's September 2017 audit report was the result of "Vale's deceit and improper interference and influence," as Vale personnel allegedly "deliberately concealed" from Auditor B the Consultant's recommendation regarding the Lab Tests, and "instructed Auditor B to delete its recommendation to revisit" the Lab Tests. Compl. ¶¶ 93, 95, 97. But this report twice cites to a liquefaction studies report issued by Auditor A that explicitly discusses the Consultant's advice, notes issues with certain Lab Test results, and includes tables with the Lab Test results, including the purportedly "unreliable" values. *See generally* Auditor A Liquefaction Studies Report, Ex. 19 (listing Consultant's memo under "References," observing ███████████████████████████████ ███████████████████████████████); *see also* Engineering Firm One's PIESEM Presentation, at 27–28, Ex. 24 (cited at Compl. ¶ 103) (███████████████████████ █████████████████████████████████████████████████ █████████████████████).[11] These contradictory allegations are insufficient, and should be disregarded. *Bristol-Myers Squibb*, 312 F. Supp. 2d at 555.

As for the March 2018 DCE, also issued by Auditor B, the SEC alleges in a conclusory

---

[11]    Auditor B's audit report notes that, ████████████████████████████████ ███████████████████████ Auditor B September 2017 RISR, at 37, 46, Ex. 18. That document, in turn, explicitly references the July 20 Memo from Auditor A's Consultant and discusses that Consultant's recommendations and the Lab Tests. *See* Auditor A Liquefaction Studies Report, at 1–6, Ex. 19.

fashion that Vale "deliberately concealed" from Auditor B the results of analyses by Engineering Firm One and Auditor C.  Compl. ¶ 101.  But documents incorporated into the Complaint show that Vale voluntarily disclosed all of the allegedly "concealed" information to the PIESEM in November 2017—all of whom had the technical capacity to analyze and understand it.  *See* Engineering Firm One's PIESEM Presentation, Ex. 24; Report of the Second Meeting of the PIESEM, at 2, 10, 18, Ex. 15 (cited at Compl. ¶ 36).  The Complaint offers no plausible explanation for why Vale would have deliberately concealed this information from Auditor B but voluntarily shared it with the PIESEM, particularly when the documents cited in the Complaint reflect that the PIESEM and Auditor B were attending joint meetings at Vale's invitation.  *See id.* at 10 (Auditor B gave a presentation at the meeting).  The inferences the Complaint asks the Court to draw here are illogical and thus do not raise a strong inference that Vale "deliberately concealed" the results of these analyses from Auditor B.  Because the SEC does not allege that Vale interfered in any other way with the issuance of the September 2017 and March 2018 DCEs, its good-faith reliance on Auditor B's expertise and judgment, as required by the applicable legislation, precludes a finding of scienter.  *See Foley*, 861 F. Supp. 2d at 212.

  **c.  The Complaint Fails To Adequately Allege That Vale Pressured Auditor C**

  The SEC next alleges that Vale personnel suddenly changed course, giving up on their alleged scheme to hide the Consultant's recommendations, and instead chose to give the recommendations to Auditor C and at the same time pressure Auditor C to issue DCEs.  *See* Compl. ¶ 146 (alleging that Auditor C "excluded laboratory data consistent with the PIESEM and Liquefaction Expert's recommendations"); *id.* ¶ 138 (alleging that Vale mounted a "pressure campaign" against Auditor C).  But the Complaint offers no explanation as to how or why this unrealistic switch away from Vale's alleged plot occurred.  The Complaint's implicit admission

that Vale shared the Consultant's recommendations with Auditor C undercuts allegations regarding the deliberate concealment thereof from anyone, including investors.

The Complaint's further allegation that the June 2018 DCE for Dam 1 was fraudulently obtained because Vale pressured Auditor C to sign the DCE and rewarded Auditor C with a lucrative contract when it "succumbed" to Vale's pressure, *see* Compl. ¶¶ 142, 157, 160, fares no better.  In particular, the Complaint contains no well-pled allegations that Vale believed that Dam 1 was unstable and should not receive a DCE.  And while the Complaint references what the SEC admits to be "internal emails" exchanged *among Auditor C employees* speculating that Vale would "throw [them] against the wall" or use another contract as "blackmail," Compl. ¶¶ 150, 154, 158, it contains no well-pled allegations that *Vale* actually applied any such pressure or engaged in any form of blackmail.  The Complaint also alleges that at a meeting in May 2018 Executive One "reminded Auditor C of the impending deadline for the stability declaration" and "pointedly asked whether Auditor C would issue it." *Id.* ¶ 156.  But Executive One's concern with meeting the regulatory deadline does not raise a strong inference that Vale exerted any undue pressure to engage in fraud or otherwise engaged in inappropriate behavior.

### 3.  The SEC Fails To Adequately Allege That Vale Improperly Removed Auditors

The SEC further alleges in a conclusory fashion that Vale "removed" Engineering Firm One from work on the June 2018 RPSB because it supposedly refused to "refine" its liquefaction studies or "reassess its work." *See, e.g.*, Compl. ¶¶ 134, 142.  Here again it fails to allege the who and where of this "removal," *see, e.g.*, *id.* ¶¶ 135, 142, and therefore fails to satisfy the heightened burden that applies to its claim.  In addition, this conclusory allegation is (again) also contradicted by the Complaint itself, which acknowledges that Auditor C had been hired alone to conduct the RPSB—Engineering Firm One was never hired to work on the RPSB, and so could

-28-

not have been "removed."  *See id.* ¶ 89.  Further, "removing" Engineering Firm One from work

at Dam 1 would have been pointless, as it would not have changed any results:  the RPSB and

the Dam Rupture Probability Analysis both disregarded the Lab Tests (just as Engineering Firm

One and the Consultant had suggested) and found a 1.09 safety factor for Dam 1 (virtually the

same result that Engineering Firm One presented to PIESEM in November 2017).  *See id.* ¶ 162.

The SEC next speculates that Vale replaced Auditor B with Auditor C for the September

2018 RISR audit to obtain a "false stability declaration."  Compl. ¶ 179.  Again, despite the

SEC's investigation, the Complaint fails to allege who made the decision to replace Auditor B

with Auditor C, or when.  And, the Complaint itself acknowledges a "more likely" explanation

for the switch.  *See Iqbal*, 556 U.S. at 681.  Under the SEC's own recitation of the events, Vale

transferred the September 2018 audit to Auditor C because Auditor B could not commit to

finishing the audit, including review of the new data, by the regulatory deadline, *see id.* ¶ 182,

whereas Auditor C had just finished the "more extensive and in-depth safety audit" in June 2018,

*see id.* ¶ 27, and therefore had comprehensive, up-to-date information about the dam.  "Where a

complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the

line between possibility and plausibility of entitlement to relief."  *Iqbal*, 556 U.S. at 678.  Even

under Rule 8, allegations must contain sufficient factual detail "to raise a right to relief above the

speculative level."  *See ATSI*, 493 F.3d at 98.  So too here.

The allegations in the Complaint provide explanations for the selection of the particular

auditors that are clearly consistent with lawful behavior: (1) Auditor C was contractually

responsible for the liquefaction analysis underlying the RPSB; (2) the virtual equivalency

between Engineering Firm One's presentation to the PIESEM in November 2017 and the RPSB

and Dam Rupture Probability Analysis prepared in 2018 undermines any inference that Vale had

an ulterior motive to remove Engineering Firm One; and (3) Auditor B could not finish the

September 2018 RISR before the regulatory deadline.  *See Iqbal*, 556 U.S. at 680 (complaint

fails when it pleads facts that are "compatible with [and] indeed more likely explained by,

lawful" conduct).  The SEC therefore fails to adequately plead any scienter, let alone a "strong

inference" that Vale improperly influenced any audits for Dam 1.

### C.  The Complaint Fails To Allege Scienter Imputable To Vale

In addition to the foregoing, the SEC's scienter allegations also independently fail to raise

a strong inference of scienter against Vale because they are based on the actions of junior

employees whose mental state cannot be imputed to Vale as a matter of law.

To plead corporate scienter, a plaintiff must plausibly allege facts that "create a strong

inference that someone whose intent could be imputed to the corporation acted with the requisite

scienter."  *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Cap.*, 531 F.3d 190, 195

(2d Cir. 2008).  Whether an employee's scienter is imputable to a corporation "depends on

whether [the employee] was a sufficiently senior officer at the company," and "the connection

between the [employee's] role and the fraudulent statements."  *Barrett*, 2017 WL 3995606, at *7.

Only "management level" employees "can serve as proxies for the corporation."  *Id.*; *see also*

*Thomas v. Shiloh Indus.*, No. 15 CV 7449 (KMW), 2017 WL 2937620, at *3 (S.D.N.Y. July 7,

2017).  The SEC must plead facts with particularity that show employees were sufficiently senior

for their scienter to be imputable to Vale.  *Thomas*, 2017 WL 2937620, at *4–5.

While there is no "bright-line rule" defining "management-level employee," *Barrett*,

2017 WL 3995606, at *7, "the fact that an employee is not part of senior management weighs

strongly against imputation" of their scienter to the company.  *Thomas*, 2018 WL 4500867, at

*4; *see also, e.g.*, *Barrett*, 2017 WL 3995606, at *7 (refusing to impute scienter to company

where complaint failed to allege that employee belonged to or reported directly to senior management).  None of the employees alleged to have scienter about Dam 1's purported instability were members of Vale's management team or even reported directly to senior management:  as alleged in the Complaint, Executives Two and Three were two levels removed from Vale's CEO, Executive One was three levels removed, and the GRG Manager was four levels removed.  *See* Compl. ¶ 44.  Although the SEC makes conclusory allegations that Executives Two and Three were "senior executives" with "extensive managerial responsibilities," *id.*, it does not plead with the requisite particularity that these employees had any "policy-making duties or powers" or that they "managed more than a handful of other employees."  *Thomas*, 2018 WL 4500867, at *5.

Moreover, to the extent the SEC seeks to impute scienter to Vale because these junior Vale personnel were involved in drafting the relevant disclosures, the Complaint fails to connect these employees in any way to several of the alleged misstatements and omissions.  *First*, the SEC fails entirely to plead facts connecting any employees to three of the challenged disclosures: the October 6, 2016 meeting minutes,[12] the October 2016 investor presentation, and the April 10, 2018 *Valor Econômico* article.  *See* Compl. ¶¶ 222–26, 234–36.  The SEC therefore has not adequately alleged Vale's scienter as to these statements as a matter of law.

*Second*, the Complaint contains no specific allegations connecting the 2018 ESG Webinar or the Form 6-K to anyone alleged to have scienter.  While the SEC generally alleges that "the GRG Manager, Executive One, Executive Two, and Executive Three[ ] were the underlying source of" all the other alleged misstatements, *id.* ¶ 254, this broad statement is

---

[12]     In fact, the meeting minutes show that none of the individuals whose scienter the SEC alleges should be imputed to Vale were even present at the presentation.  *See* Meeting Minutes from G.E.S. Investor Presentation (Oct. 6, 2016), at 1, Ex. 24 (cited at Compl. ¶ 222) (showing list of meeting participants).

insufficient to meet the pleading burden.  *See, e.g.*, *Jackson v. Abernathy*, 960 F.3d 94, 99 (2d Cir. 2020) (refusing to impute scienter because "[w]e can . . . only guess what role those employees played in crafting or reviewing the challenged statements"); *Villare v. Abiomed, Inc.*, No. 19 Civ. 7319 (ER), 2021 WL 4311749, at *22 (S.D.N.Y. Sept. 21, 2021) (rejecting corporate scienter in part because complaint failed to specifically connect relevant employee with "the formulation" of challenged disclosures).  Therefore, even if the Complaint adequately pleaded the requisite intent of certain employees (which it does not), the claims with respect to the alleged misstatements in these sources should be dismissed.  *See Hou Liu v. Intercept Pharms., Inc.*, No. 17-CV-7371 (LAK), 2020 WL 1489831, at *17 (S.D.N.Y. Mar. 26, 2020) (rejecting corporate scienter in part because complaint failed to sufficiently plead that employees with relevant knowledge "approved or were aware of the allegedly misleading statements").

Because the SEC alleges neither that the employees whose supposed intent it seeks to impute to Vale were sufficiently senior nor that they were directly involved in crafting the alleged misstatements, even if there was any inference of scienter—let alone a *strong* inference—it cannot be ascribed to Vale.

## II.   THE SEC'S NEW ALLEGED MISSTATEMENTS ARE INACTIONABLE

Material misrepresentation claims under Sections 10(b) and 13(a) of the Exchange Act or Section 17(a) of the Securities Act all require an actionable misstatement or omission.  The SEC relies on a number of alleged misstatements that the Class Action plaintiffs did not deem worthy of inclusion in their complaint, and that the Court therefore did not address in that case:  (1) two new alleged misstatements from the October 6, 2016 meeting minutes with one investor (Compl. ¶ 222); (2) four new alleged misstatements from the October 2016 investor presentation to one investor (Compl. ¶ 222); and (3) four new alleged misstatements from a December 11, 2018 ESG

webinar (Compl. ¶ 245).  Each of the SEC's new alleged misstatements is inactionable because it is (1) not false or misleading, (2) a statement of opinion, and/or (3) puffery.

### A.  The Complaint Fails To Adequately Allege That Certain Challenged Misstatements Are False Or Misleading

To state a claim under Sections 10(b), 13(a) and 17(a), a plaintiff must adequately plead that a defendant's statement was false or misleading at the time it was made, regardless of "what happens later."  *In re Barrick Gold Corp. Sec. Litig.*, 341 F. Supp. 3d 358, 371 (S.D.N.Y. 2018); *see In re Lululemon Sec. Litig.,* 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014).  Here, the SEC fails to satisfy this basic requirement with respect to at least three of its newly alleged documents.

*First*, the SEC alleges that Vale's statement in the October 2016 investor presentation that its external audit for 2016 "incorporated new regulations requiring 'analysis on undrained condition,'" was false and misleading.  Compl. ¶ 222.  But the SEC does not provide a factual basis for the bare falsity allegation.  That is because the external audit *did* incorporate such an analysis.  *See, e.g.*, Meeting Minutes from G.E.S. Investor Presentation (Oct. 6, 2016), at 3, Ex. 24 (describing new legislation of the Brazilian state of Minas Gerais that had been incorporated in the external audit).  Similarly, the Complaint contains no allegations showing that Vale's statement that its external audits incorporated "learnings related to the accident of the Fundão dam" were false.  Compl. ¶ 222; *see, e.g.*, *Ark. Pub. Emps. Ret. Sys.*, 28 F.4th at 355 (statements that clinical trial was strongly designed were not actionable because plaintiffs failed to allege facts indicating they were false).

*Second*, the statements in Vale's 2018 ESG Webinar that "[i]n 2018, all Vale's iron ore tailings dams were audited," and that "in addition to regulatory compliance, Vale works proactively with complementary processes and initiatives," Compl. ¶ 245, are also not adequately alleged to be false or misleading.  The first of these statements makes no

representation about either the process or its role in the audits or the outcomes thereof; rather, it simply and accurately states that Vale's dams were audited in 2018.  If the DCEs for Dam 1 were negative, as the SEC asserts they should have been, this statement would still have been true. The second statement is plainly not misleading, as the *Complaint* affirmatively alleges that Vale worked with "complementary processes and initiatives" including a geotechnical risk management system, the PIESEM, and geotechnical leadership committee.  *See, e.g.*, Compl. ¶ 102 ("The PIESEM was a panel of outside experts . . . whom Vale hired to provide advice on strengthening its dam safety risk management, improving its engineering practices, and ensuring adherence to international best practices.").  Again, the SEC's subjective disagreement with the outcome of those processes does not mean that the statement did not accurately reflect that complementary processes were used.  *See Altayyar v. Etsy, Inc.*, 242 F. Supp. 3d 161, 174 (E.D.N.Y. 2017), *aff'd*, 731 F. App'x 35 (2d Cir. 2018) ("The plaintiffs may disagree with the defendants' opinions, but disagreement does not render the opinions false.").

*Third*, the SEC alleges that a slide in Vale's 2018 ESG Webinar listing applicable legal requirements—such as "semiannual external audit with DCE" and "dam safety periodic performance review with DCE"—was false and misleading.  Compl. ¶ 245.  But this Court has previously found in the Class Action that statements such as this one "that merely acknowledge legal obligations . . . make no misleading commitments or representations."  *In re Vale S.A. Sec. Litig.*, 2020 WL 2610979, at *13; *see also Fogel v. Vega*, 759 F. App'x 18, 23 (2d Cir. 2018).

## B.   Other Alleged Misstatements And Omissions Are Inactionable Statements Of Opinion And Must Be Dismissed

"[S]ubjective statements of opinion are generally not actionable as fraud."  *Bldg. Trades Pension Fund of W. Pa. v. Insperity, Inc.*, No. 20 Civ. 5635 (NRB), 2022 WL 784017, at *7 (S.D.N.Y. Mar. 15, 2022).  An opinion statement is "not misleading just because external facts

show the opinion to be incorrect." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 188 (2015).  Rather, the SEC has the burden to plead that either "the speaker did not hold the belief she professed," "the supporting facts she supplied were untrue," or "the speaker omit[ted] information whose omission makes the statement misleading to a reasonable investor." *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016).  In addition, such statements of opinion are not misleading merely because one expert would have weighed the underlying data differently or that others, with the benefit of hindsight, would have reached a different conclusion.  *See, e.g.*, *Kleinman*, 706 F.3d at 154 ("[W]here a defendant's competing analysis or interpretation of data is itself reasonable, there is no false statement.").  "Reasonable investors understand that opinions sometimes rest on a weighing of competing facts. . . . and do[] not expect that *every* fact known to an issuer supports its opinion statement." *Omnicare*, 575 U.S. at 189–90.  This is true even when the external facts are "the contrary opinion of an expert or authority." *Martin*, 732 F. App'x at 41.

The SEC twice alleges misstatements based on Vale's representations in the October 2016 meeting minutes—from a meeting between Vale and a single investor—that Vale "us[ed] a 'rigorous' process that was 'conservative' in modeling for liquefaction," and in the associated October 2016 presentation, that its external audits "entailed a rigorous review of existing engineering studies."  Compl. ¶ 222.  These characterizations of Vale's actions as "rigorous" and "conservative" represent Vale's subjective opinions as to how it carried out these processes.  It is not enough for the SEC to allege that it or others might disagree with these opinions, and the SEC fails to allege any "conflict with what a reasonable investor would take from the statement itself." *Tongue*, 816 F.3d at 211.

Further, the context of the investor presentation also makes clear that there were well-

founded technical bases supporting the conclusion that the process was indeed "rigorous" and "conservative."   The investor presentation listed four reasons why this analysis was more rigorous:  ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████   *See* Meeting Minutes from G.E.S. Investor Presentation (Oct. 6, 2016), at 3, Ex. 24.  The investor presentation further explained that ████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████   *Id.*  Given that Vale plainly disclosed the bases for its stated opinions in the meeting minutes and that the Complaint fails to allege that any of these bases were not genuinely believed to be rigorous or conservative by the speakers, there can be no liability for these opinions.  *Omnicare*, 575 U.S. at 194 ("[T]o avoid exposure for omissions . . . an issuer need only divulge an opinion's basis.").

The SEC also challenges Vale's statement from the October 2016 investor presentation that its external audits for 2016 were conducted in the "presence of international auditors, incorporating the vision of good practice in the world," Compl. ¶¶ 222–24, because Vale failed to state that Auditor A decided not to follow its Consultant's recommendations to discard the Lab Tests for Dam 1, *id.* ¶¶ 223–24.  But it is well settled that an opinion statement is "not misleading simply because the issuer knows, but fails to disclose, some fact cutting the other way."  *Omnicare*, 575 U.S. at 176; *see, e.g.*, *In re Pretium Res. Inc. Sec. Litig.*, No. 18 CIV. 8199, 2020 WL 953609, at *5 (S.D.N.Y. Feb. 27, 2020) (failure to disclose waste rock data indicating that mine plan was not viable did not make statements expressing confidence in mine plan misleading).  Here, the Consultant's view of the Lab Tests is not even a fact, just an

-36-

opinion, disclosure of which was not required. *See, e.g.*, *Martin*, 732 F. App'x at 24 (defendant not required to disclose expert's contrary opinion). Nor is the opinion statement that Vale's "actions related to dam safety are taken beyond the legislation requirements" false or misleading simply because, as the SEC alleges, Vale omitted that Auditor A disagreed with its Consultant about the use of certain data. *See id.*; Compl. ¶¶ 222–23.

### C. Certain Alleged Misstatements Or Omissions Must Be Dismissed As Inactionable Puffery

General statements of corporate optimism are non-actionable puffery. *See City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014); *see also In re Liberty Tax Inc. Sec. Litig.*, 828 F. App'x 747, 751 (2d Cir. 2020) (statements providing no "affirmative guarantees" or not describing "specific steps" taken "to achieve particular results" are puffery). Vague or self-congratulatory statements are "inactionable as a matter of law because they are too general to cause a reasonable investor to rely upon them." *Gross v. GFI Grp., Inc.*, 784 F. App'x 27, 29 (2d Cir. 2019). In addition to being inadequately alleged opinion statements, two of the SEC's new alleged misstatements should be dismissed as puffery:

- Vale's statement that all of its "dams in the Iron Ore Business are safe," Compl. ¶ 222, is a classic example of a "general and self-congratulatory statement[] about a [company's] commitment to safety that this and other circuits have consistently held to be inactionable." *In re Peabody Energy Corp. Sec. Litig.*, No. 20-CV-8024 (PKC), 2022 WL 671222, at *13–14 (S.D.N.Y. Mar. 7, 2022) (statements about "record safety" were inactionable puffery although defendant was on notice of safety issues at mine).

- Vale's statement that "[t]he panels of national and international experts are of great importance and contribute by bringing a critical view on Vale's management model, the methodologies used throughout the process and acting as consultants on safety issues," Compl. ¶ 245, is a paradigmatic "[v]ague positive statement[] regarding a corporate entity's risk management strategy, asset quality, and business practices" that courts in the Second Circuit have found to be inactionable puffery. *Francisco v. Abengoa, S.A.*, No. 15 CIV. 6279 (ER), 2022 WL 3902852, at *18 (S.D.N.Y. Aug. 30, 2022). As this Court has held, "[s]uch vague language about Vale's general attention to risk management

cannot be reasonably understood as material." *In re Vale*, 2020 WL 2610979, at *13.

## III.   THE SEC FAILS TO ADEQUATELY PLEAD MATERIALITY

Under Sections 10(b) and 13(a) of the Exchange Act and Section 17(a) of the Securities

Act, any alleged misstatement or omission must be material.  A misstatement or omission is

material if there is a "substantial likelihood that a reasonable person would consider it important

in deciding whether to buy or sell shares of stock." *Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d

Cir. 2019).  The SEC's alleged misrepresentations fail to meet the materiality threshold.

Here, the allegedly omitted information—concerning only one of Vale's more than 150

tailings dams or dikes, which was previously shut down—was far too granular to meet this

standard.  The SEC alleges that Auditor A retained a Consultant to assist with an audit in 2016,

Compl. ¶ 49, and that this Consultant recommended discarding the Lab Tests and using only

Field Tests to calculate safety factors for the audit, *id.* ¶¶ 58, 64, 73–75.  Auditor A ultimately

rejected the Consultant's view, and instead used a weighted approach that relied more heavily on

Field Tests and less on the Lab Tests to calculate the safety factor for the 2016 audit.  *Id.* ¶ 79.[13]

It would not have had a material impact on reasonable investors had Vale disclosed that,

against the recommendation of a consultant, its auditor relied on Lab Tests as a part of its

calculation of the safety factor for the 2016 audit of a non-operational dam.  That Vale's auditors

relied in part on the Lab Tests is "far too attenuated from the alleged" misrepresentation as to

Dam 1's safety.  *See Ong v. Chipotle Mexican Grill, Inc.*, 294 F. Supp. 3d 199, 233 (S.D.N.Y.

---

[13]     While the Class Action makes broad claims about Vale's supposed knowledge of Dam 1's instability and the alleged inadequacy of Vale's programs to mitigate health and safety incidents, *In re Vale S.A. Sec. Litig.*, No. 19-cv-526 (RJD) (SJB), Dkt. 47 (E.D.N.Y.), the SEC Complaint instead focuses on much narrower allegations.  For instance, the SEC repeatedly alleges that disclosures were misleading because Vale omitted to state that an auditor's Consultant had recommended against the use of the Lab Tests in the analysis of Dam 1 and some of Vale's auditors, based on their expert judgment, nonetheless relied on the Lab Tests.  *See* Compl. ¶¶ 1, 14, 48, 58, 62–82, 85–86, 91, 93–96, 103–06, 110, 116, 118, 121–22, 125–26, 131, 137, 223, 225, 243, 248, 260, 263, 277, 280, 283.  This piece of information would be "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."  *See Gross*, 784 F. App'x at 29–30.

2018) (a restaurant chain company's omission of its inability to trace its ingredients back to suppliers was too attenuated from an alleged misrepresentation regarding its use of multiple suppliers to trigger a duty to disclose). The SEC cannot allege that there is a straight line from partial reliance on the Lab Tests to a view that Dam 1 was unstable or at a heightened or unacceptable risk of collapse. As explained above, *supra* Argument I.B.1, all auditors and the PIESEM knew what the safety factors were when calculated without the Lab Tests, and none of them raised any concerns about the dam's stability. Rather, they visited the dam, considered other data about the dam, considered it to be stable, and specifically stated that no additional interventions were needed at the time. Within that context, the allegation that Auditor A used the Lab Tests in its stability analysis would have been immaterial to any reasonable investor.

The same logic applies to the SEC's claims that Vale's disclosures were false and misleading because they omitted that (1) the safety factor for Dam 1 was 1.09, and (2) Dam 1 was one of three dams in the Attention Zone of a probability analysis. Compl. ¶ 235. As to Dam 1's safety factor and general risk of liquefaction, the SEC does not allege that merely having a safety factor of 1.09 or general risks of liquefaction mean that a dam is unsafe. Similarly, the Complaint does not allege that the results of Dam 1's probability analysis meant that the dam was unstable or that an auditor could not choose to issue a positive DCE. Furthermore, if Vale had disclosed this information, it would have contextualized such disclosures with assurances that its tailings dams were safe because Vale and the leading experts reasonably believed that to be the case at the time. *See ECA*, 553 F.3d at 197 ("[T]he determination of whether an alleged misrepresentation is material necessarily depends on all relevant circumstances."). The SEC does not explain how, before Dam 1's failure, Vale's reporting a safety factor of 1.09 instead of 1.3 for a dormant dam, or the dam's failure probability of 3 in 10,000 chance per year from

-39-

liquefaction, would have had a material impact on reasonable investors.

## IV.   THE SEC FAILS TO ADEQUATELY PLEAD SCHEME LIABILITY

Rule 10b-5(a) and (c) and Section 17(a) create so-called "scheme liability" by prohibiting "manipulative or deceptive acts in furtherance of an alleged scheme to defraud." *In re Garrett Motion Inc. Sec. Litig.*, No. 20 CIV. 7992 (JPC), 2022 WL 976269, at *17 (S.D.N.Y. Mar. 31, 2022).  The SEC's scheme liability claims here fail not only because the Complaint does not adequately plead scienter, *see* Argument I, but also because the SEC fails to plead that any of the alleged acts—that is, Vale's supposed concealment of dam reports or a consultant's recommendation from an auditor, *see, e.g.*, Compl. ¶¶ 78–81, 93–98, 112–16; its alleged "pressure" on auditors to issue positive stability certificates, *id.* ¶¶ 123–30, 138–61; or its supposedly improper removal of auditors, *id.* ¶¶ 182–88—amount to a scheme to defraud.

The SEC claims that the primary purpose and effect of the allegedly deceptive acts was to make public misstatements or omissions about the stability of Dam 1, *i.e.*, that Dam 1 had positive DCEs.  *See, e.g.*, Compl. II.A-E.  But conduct that is deceptive only because of a subsequent material misstatement or omission is insufficient for a scheme liability claim.  *See Rio Tinto*, 41 F.4th at 49; *see also Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 177 (2d Cir. 2005) (misstatements or omissions cannot form "sole basis" for scheme liability).  The SEC cannot "shoehorn its allegations into a claim for scheme liability." *Rio Tinto*, 41 F.4th at 52.

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed with prejudice.

Dated: September 29, 2022

Respectfully submitted,

CLEARY GOTTLIEB STEEN & HAMILTON LLP

/s/ *Jennifer Kennedy Park*
Lev L. Dassin (ldassin@cgsh.com)
Matthew C. Solomon (msolomon@cgsh.com)
Jennifer Kennedy Park (jkpark@cgsh.com)
Jared Gerber (jgerber@cgsh.com)
Andrew Weaver (aweaver@cgsh.com)
Samuel Levander (slevander@cgsh.com)
Pedro Martini (pmartini@cgsh.com)
One Liberty Plaza
New York, NY 10006
Telephone: (212) 225-2000

*Counsel for Defendant Vale S.A.*