UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | | |
| | Plaintiff, | |
| v. | | 22-cv-2405 (LDH) (SJB) |
| VALE, S.A., | | |
| | Defendant. | |

## PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S
## MEMORANDUM IN OPPOSITION TO MOTION TO DISMISS

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT...............................................................................1

THE COMMISSION'S ALLEGATIONS AGAINST VALE.......................................3

   I.     The Collapse....................................................................................3

   II.    Brazil's Dam Safety Audit Regime...............................................4

   III.   Vale Improperly Secured False Stability Declarations for Dam 1................6

      A. Auditor A..................................................................................7

      B. Auditor B..................................................................................7

      C. Auditor C..................................................................................9

   IV.   Vale's Materially False Statements to Investors.........................11

LEGAL STANDARDS.....................................................................................13

ARGUMENT....................................................................................................14

   I.     THE COMPLAINT ADEQUATELY ALLEGES VALE'S SCIENTER...................15

      A. The Complaint Adequately Alleges a Strong Inference of Scienter............15

         1.  Vale's Argument that Documents Incorporated in the Complaint Show that Dam 1 Appeared Stable Does Not Negate The Strong Circumstantial Evidence of Scienter.....................................................................16

         2.  The SEC Adequately Alleges that Vale Concealed Information from or Improperly Pressured Auditors and Experts.................................19

            a.  The Complaint Alleges that Vale Acted in Concert with Auditor A to Include Unreliable Lab Data....................................19

            b.  The Complaint Alleges that Vale Withheld Information from Auditor B, and Documents Referenced by Vale Do Not Show Otherwise.................20

            c.  The Complaint Adequately Alleges that Vale Pressured Auditor C............22

         3.  The SEC Adequately Alleges that Vale Improperly Removed Auditors................23

      B. The Complaint Adequately Alleges Motive and Opportunity......................25

C.   The Complaint Alleges Scienter Imputable to Vale......................................................26

II.   VALE'S MISREPRESENTATIONS TO INVESTORS IN OCTOBER 2016 AND IN ITS 2018 ESG WEBINAR ARE ACTIONABLE.........................................................28

A.   The Complaint Adequately Pleads Falsity With Respect to the October 16, 2016 Investor Presentation.....................................................................................................28

B.   The Statements in the 2018 ESG Webinar, When Placed in Context, Are False and Misleading......................................................................................................................29

C.   Vale's Other Misstatements Are Not Inactionable Statements of Opinion..................31

D.   None of Vale's Misstatements Can be Properly Described as Puffery As They Are Not Vague or Self-Congratulatory Statements....................................................................33

III.   THE COMPLAINT THOROUGHLY ALLEGES FACTS THAT ARE MATERIAL TO A REASONABLE INVESTOR.............................................................................35

IV.   THE COMPLAINT ALLEGES FRAUDULENT CONDUCT BEYOND MISSTATEMENTS.................................................................................................38

V.   IN THE ALTERNATIVE, IF THE COURT GRANTS ALL OR A PART OF VALE'S MOTION TO DISMISS, THE SEC REQUESTS LEAVE TO AMEND THE COMPLAINT..........................................................................................................40

CONCLUSION....................................................................................................................40

# <u>TABLE OF AUTHORITIES</u>

## Cases

*Altayyar v. Etsy, Inc.*, 242 F. Supp. 3d 161 (E.D.N.Y. 2017)..................................................29, 30

*Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343 (2d Cir. 2022)..................33

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...................................................................................... 13

*Barrett v. PJT Partners Inc.*, No. 16-CV-2841 (VEC), 2017 WL 3995606
(S.D.N.Y. Sept. 8, 2017) ................................................................................................... 26, 27, 28

*Basic Inc. v. Levinson.*, 485 U.S. 224 (1988)........................................................................ 33, 35

*Chambers v. Time Warner, Inc.*, 282 F.3d 147 (2d Cir.2002) ...................................................... 14

*Cognex Corp. v. Microscan Sys., Inc.*, 990 F. Supp. 2d 408 (S.D.N.Y. 2013)............................ 14

*Federal Housing Finance Agency v. Nomura Holding America, Inc.*, 104 F. Supp. 3d 441
(S.D.N.Y. 2015) .......................................................................................................................... 32

*Fogel v. Vega*, 759 F. App'x 18 (2d Cir. 2018) ........................................................................... 35

*Foley v. Transocean Ltd.*, 861 F. Supp. 2d 197 (S.D.N.Y. 2012) ................................................ 18

*Ganino v. Citizens Utilities Co.*, 228 F.3d 154 (2d Cir. 2000) .................................................... 36

*IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scot. Grp., PLC*,
783 F.3d 383 (2d Cir. 2015)......................................................................................................... 36

*In re Bank of Am. Corp. Sec., Derivative & ERISA Litig.*, No. 09-MD-2058(PKC),
2011 WL 3211472 (S.D.N.Y. July 29, 2011).................................................................................39

*In re Chembio Diagnostics, Inc.*, 586 F. Supp. 3d 199 (E.D.N.Y. 2022) .................................... 26

*In re Marsh & McLennan Cos. Sec. Litig.*, 501 F. Supp. 2d 452 (S.D.N.Y. 2006).................... 27

*In re MBIA, Inc. Sec. Litig.*, 700 F. Supp. 2d 566 (S.D.N.Y. 2010) ........................................... 27

*In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386 (S.D.N.Y. 2016)................................................... 26

*In re Tenaris S.A. Sec. Litig.,* 493 F. Supp. 3d 143 (E.D.N.Y. 2020).......................................... 26

*In re Vale S.A. Sec. Litig.*, No. 19-CV-526 (RJD) (SJB), 2020 WL 2610079
(E.D.N.Y. May 20, 2020)................................................................................................... passim

*KCG Americas LLC v. Brazilmed LLC*, 15:CV:4600 (AT), 2016 WL 900396
(S.D.N.Y. Feb. 26, 2016) ........................................................................................................ 14

*Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000) ............................................................................ 15

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
575 U.S. 175 (2015) ........................................................................................... 31, 32, 33

*Pasternack v. Shrader*, 863 F.3d 162 (2d Cir. 2017) .................................................................... 40

*S.E.C. v. Collins & Aikman Corp.*, 524 F. Supp. 2d 477 (S.D.N.Y.  2007) ............... 14, 16, 17, 24

*S.E.C. v. MiMedx Group, Inc.*, No. 19 Civ. 10927 (NRB), 2022 WL 902784
(S.D.N.Y. Mar. 28, 2022) ....................................................................................................... 39

*S.E.C. v. One or More Unknown Traders in Sec. of Onyx Pharms. Inc.*, No. 13-CV-4645 JPO,
2014 WL 5026153 (S.D.N.Y. Sept. 29, 2014) ....................................................................... 16

*S.E.C. v. O'Rourke*, 19-CV-4137 (KAM)(PK), 2019  WL 8325092
(E.D.N.Y. April 14, 2019). ..................................................................................................... 25

*S.E.C. v. Rio Tinto PLC*, 41 F.4th 47 (2d Cir. 2022) ............................................................. 39, 40

*S.E.C. v. RPM Int'l., Inc.*, No. 16-1803, 2017 WL 4358693 (D.D.C. Sept. 29, 2017) ................. 32

*S.E.C. v. Takeyasu*, No. 1:17-CV-4866-GHW, 2018 WL 2849777
(S.D.N.Y. June 11, 2018) ........................................................................................................ 39

*Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64 (2d Cir. 2021) .................................... 25, 26

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Cap., Inc.*, 531 F.3d 190
(2d Cir. 2008) ......................................................................................................................... 26

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) ............................................. 15

*Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016) ........................................................................... 31

*U.S. Commodity Futures Trading Comm'n v. Wilson*, 27 F. Supp. 3d 517
(S.D.N.Y. 2014) .......................................................................................... 14, 20, 22, 24, 25

**Other Authorities**

*Consolidated Class Action Complaint for Violations of the Federal Securities Laws, In Re Vale S.A.
Sec. Litig*, No. 19-cv-526-RJD-SJB (E.D.N.Y), Dkt. 47 ....................................................... 34

**Federal Rules of Civil Procedure**

Fed. R. Civ. P. 9(b) ................................................................................................................... 2, 14

## PRELIMINARY STATEMENT

Throughout its Motion to Dismiss, Defendant Vale S.A. mischaracterizes the allegations of Plaintiff Securities and Exchange Commission's Complaint[1] and attacks straw man arguments.  The Complaint alleges that Vale made materially false or misleading disclosures regarding the safety of one of its largest tailings dams—*not* that it committed fraud because it lacked clairvoyance concerning when that dam might collapse.  Vale repeatedly disclosed to the public that it evaluated the safety of its dams by employing a rigorous audit process supported by the best global engineering experts and that its dams were safe.  Vale omitted to tell the public, however, that it had manipulated and corrupted these audits and that it understood that, according to best engineering practices, the Brumadinho dam (also known as Dam 1) was at an unacceptable risk of collapse due to liquefaction.  This misconduct is not shielded by a generic claim that it was Vale's purported "opinion" that the dam "appeared stable."

 As alleged in the Commission's Complaint, from July 2016 until Dam 1 collapsed in January 2019, Vale was repeatedly told by its retained experts and internally acknowledged that the requisite the safety factor (the measure of tailings dam stability) for the dam's peak, undrained condition was 1.3.  And throughout that same period, Vale knew or was reckless in not knowing that Dam 1 could not meet that safety factor.  Vale misled investors about this material fact first by manipulating a series of dam safety audits and then by making misrepresentations to investors, including in reports filed or furnished to the Commission that Vale knew or was reckless in not knowing were false or misleading.  The Complaint

---

[1] Throughout this Memorandum, citations to the Complaint (ECF No. 1) are styled as "Compl., ¶ __."  Vale's Memorandum of Law in Support of Defendant's Motion to Dismiss the Complaint is referred to as "Motion" or "Mot.," and page numbers cited are those on the bottom of each page of the Motion, not the page numbers reflected in the ECF header.  Exhibits to the Declarations of Jennifer Kennedy Park are styled as "Park Decl. __."

painstakingly alleges how certain Vale executives corrupted multiple audit processes and knowingly or recklessly contributed to Vale's misrepresentations to the public. Those allegations are sufficient to state a claim for violations of the antifraud and books-and-records provisions of the federal securities laws.

Vale's motion to dismiss the Complaint commits a series of basic errors, all of which first appear in Vale's preliminary statement. Vale claims that its executives could not have known that the dam was unacceptably unsafe because it "appeared stable" in external physical inspections, and because no one understood the dam to be at imminent risk of collapse. But the Commission has not alleged that its executives ignored external signs of distress prior to the collapse. It has alleged that they knew or were reckless in not knowing that the dam could not meet the requisite safety standards, including the necessary safety factor for the peak, undrained condition—a standard measure of a tailings dam's risk of collapse due to liquefaction. The external appearance of stability is irrelevant and neither negates nor qualifies the fragility of the dam as revealed by its critically low safety factor. Moreover, the Complaint alleges that Vale's retained experts *did* in fact understand the dam was unacceptably unsafe and repeatedly warned Vale of that fact.

Vale also asks the Court to accept its version of contested facts and to draw inferences against the Commission, in violation of the standards applicable at the pleading stage. For example, Vale asserts that an auditor's "adoption of a reasonable technical opinion" cannot give rise to a claim for fraud. But the Complaint alleges that Vale's Auditor A, in concert with Vale, did not follow best engineering practices and had no basis for adopting the methodology it followed when declaring that Dam 1 met the relevant safety standards. Similarly, Vale characterizes as "junior" the executives who knew or were reckless in not knowing that the dam

was unacceptably unsafe and argues that their scienter cannot be imputed to Vale.  Yet the Complaint carefully alleges the scope of these executives' responsibility regarding the safety audit process and their participation in the creation of Vale's material misrepresentations. Accepting these allegations as true and drawing reasonable inferences in favor of the Commission, the Court should conclude that these executives' scienter can be imputed to Vale.

Finally, Vale argues that it is not relitigating the holding from the related class action's motion to dismiss but then does the opposite.  The Court has already held that Vale's statements about "safety and sustainability" are material and that its repeated statements concerning dam safety and the reliability of audits are not inactionable puffery.  Yet Vale asks the Court to revisit its prior rulings on materiality and puffery.  Likewise, the Commission's Complaint contains a similar degree of pleading particularity that the Court earlier found to be satisfactory.  Like the class action complaint, the Commission's Complaint contains allegations that identify the misstatements and omissions, describe the relevant predicate events, and explain how those events make the statements and omissions false and misleading.  As such, many of the arguments contained in Vale's Motion have already been considered and rejected by the Court.

The Commission respectfully submits that the Court should deny in its entirety Vale's Motion to Dismiss the Complaint.

## THE COMMISSION'S ALLEGATIONS AGAINST VALE

### I.     The Collapse

On January 25, 2019, Vale's tailings dam at the Córrego do Feijão Mine in Brumadinho, Minas Gerais (Dam 1) collapsed and released a torrent of mud and debris, killing 270 people and causing devastating environmental and economic harm in Minas Gerais.  Compl., ¶¶ 2, 5. According to independent experts retained by Vale after the collapse, Dam 1 ruptured due to a

geotechnical phenomenon called liquefaction, in which a triggering event causes solid mining waste inside the dam to behave like a liquid, compromising the integrity of the dam and greatly increasing the risk of collapse.  *Id.* at ¶ 5.[2]

Before and after the collapse, Vale repeatedly assured investors through Commission filings, presentations, sustainability reports, and ESG webinars that its dams had been audited to address the risk of liquefaction, that no anomalies had been identified, and that its independent stability declarations complied with regulations and international best practices and confirmed the stability and safety of the dams.  *Id.* at ¶¶ 23, 219-253.  In truth, Dam 1 was a conditionally unsafe, high damage potential, and high failure risk dam that did not meet minimum recommended safety guidelines, and Vale secured stability declarations for the dam only by manipulating audit results and disregarding accepted standards and best practices for assessing dam safety.  *Id.* at ¶¶ 47-189.

## II.    Brazil's Dam Safety Audit Regime

In 2016, Brazilian federal and state governmental bodies issued extensive new dam safety regulations requiring dam safety audits by external auditors that specifically addressed liquefaction risks.  *Id.* at ¶¶ 25-26.  The new regulations required mining companies in Brazil, including Vale, to conduct a special, or "extraordinary," audit on their upstream tailings dams in 2016 with a focus on liquefaction, and Minas Gerais authorities also required Vale to conduct a liquefaction study on Dam 1.  *Id.*  In 2017, Brazil increased the frequency of federally required dam safety inspections from annual to semi-annual, and Brazil also required dams classified as

---

[2] The resulting report and its summary, the "Executive Summary of the Independent Investigation Report," are both referenced in the Complaint (¶¶ 5, 216), and the latter is publicly available on Vale's website.  Executive Summary of the Independent Investigation Report (Feb. 20, 2020), http://www.vale.com/PT/investors/Documents/20.02.20_CIAEA_Report_i.pdf.  For ease of reference, a copy of this report is attached as Conway Decl. Ex. 1.

having high damage potential, such as Dam 1, to undergo a more extensive periodic safety review and audit every three years, with the first review ultimately due in June 2018. *Id.* at ¶ 27.

At the end of each of the audits, inspections, and reviews, the external dam safety auditor issued a report and a stability declaration, commonly referred to as a DCE,[3] certifying either that the dam was stable or that it was not. *Id.* at ¶¶ 8, 28. Brazilian regulations required these DCEs to be based on compliance with industry standards and "good engineering practices." *Id.* at ¶ 28. Vale also signed and then filed the stability certifications with state and federal authorities (depending on the type of safety audit), and would make the associated reports available to authorities as needed. *Id.*

The safety audits at issue specifically relied on a measure of dam safety known as a "safety factor," which was defined by the Brazilian Association of Technical Norms ("ABNT") as "the value of the ratio between the strength (maximum available shear stress) and the mobilized strength shear stress acting along the breach surface." *Id.* at ¶ 32. A safety factor of "1.0" represents, in theory, that the dam is at risk of imminent collapse, and a higher safety factor implies greater dam stability. *Id.* The ABNT, which set the standards by which DCEs could be issued, required the minimum safety factors for liquefaction risk to be established "based on good engineering practices." *Id.*

A safety factor can be calculated for a dam's "peak, undrained condition," which expresses a degree of confidence that the tailings within the dam will avoid liquefaction in the event of a trigger, such as an earthquake, a rapid rise in water levels, vibrations from heavy equipment or drilling, or some other combination of disturbances. *Id.* at ¶ 34. Throughout the relevant period, the minimum recommended safety factor for the peak, undrained condition was

---

[3] "DCE" is an acronym for Declaração da Condição de Estabilidade.

1.3 or higher. *Id.* at ¶ 35.  Vale's own presentations to its Executive Board and Board of Directors recognized that 1.3 was the necessary minimum safety factor for the peak, undrained condition, explaining that "auditors and worldwide practices recommend the adoption of a safety factor of 1.3." *Id.*  The engineering firms Vale hired to conduct safety audits of Dam 1 also recognized and stated in their audit reports to Vale that 1.3 was the appropriate and recommended minimum safety factor for the peak, undrained condition. *Id.* at ¶ 36.  A safety factor of less than 1.3 for the peak, undrained condition indicated that the dam's tailings were at an unacceptably heightened risk of liquefaction in the event of a trigger, and a dam with a peak, undrained safety factor less than 1.3 could not be certified as stable and safe. *Id.* at ¶ 37.

**III.    Vale Improperly Secured False Stability Declarations for Dam 1**

Vale's corporate geotechnical risk management group (the "GRG") oversaw Vale's management of dam safety risks for the iron ore division. *Id.* at ¶ 40.  The Complaint identifies four individuals within the GRG, "Executive One," "Executive Two," Executive Three," and the "GRG Manager," and details their responsibilities regarding Vale's compliance with Brazil's dam safety regulations, including all required audits, their managerial responsibilities, and their sub-certification duties under the Sarbanes-Oxley Act, upon which Vale relied for its disclosures to investors, including as to dam safety. *Id.* at ¶¶ 39-44.  Executives Two and Three, moreover, reported outside of the GRG to the Executive Director of Ferrous Minerals and Coal ("Executive Four"), who reported to the President and Chief Executive Officer of Vale. *Id.* at ¶ 41.

At all relevant times after the 2015 Fundão tailings dam collapse, Executive One and other GRG personnel knew or were reckless in not knowing that Dam 1's safety factor for the peak, undrained condition (*i.e.,* the safety factor expressing the risk of liquefaction) calculated by using the methodology "most accepted in the global technical community" was well below the

international threshold of 1.3 for the peak, undrained condition. *Id.* at ¶ 45. Despite Vale's knowledge of the low safety factor, which should have precluded the issuance of positive stability declarations, Vale improperly obtained a series of stability declarations for Dam 1, which it then fraudulently touted to investors. *Id.* at ¶ 46.

### A. Auditor A

Vale improperly secured stability declarations in August and September 2016 from its dam safety auditor, Auditor A, by using flawed and unreliable laboratory data that falsely inflated the peak, undrained safety factor to 1.3. *Id*. at ¶¶ 47-82. In May 2016, the GRG Manager sent an internal Vale presentation to Executives One and Two, among others, concluding that the safety factor for Dam 1 was unacceptably low at 1.04. *Id.* at ¶ 51. Auditor A and an internationally recognized liquefaction expert (the "Liquefaction Expert") confirmed these conclusions in meetings with and reports to Vale's GRG personnel throughout June and July 2016, and also told Vale that laboratory data for Dam 1 was unreliable and should not be used. *Id.* at ¶¶ 57-58, 62-74. July 2016 reports from Auditor A and the expert concerning the liquefaction analysis further indicated that Dam 1's safety factor fell well below international standards when using the more reliable field tests, and the only way to obtain the 1.3 safety factor necessary for the stability declaration was to use the flawed laboratory data. *Id.* Despite Vale's knowledge that the laboratory data was unsound, when Auditor A used the flawed laboratory data to issue positive stability declarations, Vale accepted and then fraudulently touted the results. *Id*. at ¶¶ 78-82, 222-233.

### B. Auditor B

Vale improperly obtained stability declarations from another safety auditor, Auditor B, whom Vale hired to conduct the state-mandated annual audits due in September 2017 and 2018,

and the federally-mandated semi-annual inspections due in September 2017, March 2018, and September 2018.  *See id*. at ¶¶ 83-137.  Vale knew that Auditor B was relying on Auditor A's flawed analysis and inflated 1.3 safety factor for the peak, undrained condition found during Auditor A's previous audit.  *Id*. at ¶ 85.  However, at the same time that Auditor B was conducting its audit, Vale knew—but concealed from Auditor B—that two third-party engineering firms, Engineering Firm One and Auditor C, whom Vale had hired to perform a failure probability analysis on Dam 1, were refusing to use the extraordinary audit's results because all the laboratory data used by Auditor A was unreliable.  *Id*. at ¶¶ 89-95.  Also, even though Auditor B requested more information from Vale about the ratios underlying the 1.3 safety factor found during the extraordinary audit, Vale personnel concealed from Auditor B the July 2016 reports that showed the proper use of field data alone would result in unacceptably low ratios and that a 1.3 safety factor could only be achieved if Auditor A used unreliable laboratory data.  *Id*. at ¶¶ 86-96.  In short, Vale knew that Dam 1's true safety factor of approximately 1.04 precluded issuance of a DCE, but it hid that fact and additional information from Auditor B and, through that deceit, secured a stability declaration and report for Dam 1 in September 2017 that falsely stated Dam 1's safety factor met the requisite minimum of 1.3.  *Id.* at ¶¶ 94-98.

Between October 2017 and March 2018, the same third-party engineering firms repeatedly informed Vale's GRG and operational geotechnical personnel that Dam 1 did not meet the requisite 1.3 minimum safety factor, and that they had determined Dam 1's safety factor was an unacceptably low 1.06.  *Id*. at ¶¶ 99-137.  A panel of international and national experts (the "PIESEM"), retained by Vale to advise it on dam safety governance issues and best practices for conducting liquefaction assessments, also told Vale's GRG and operational geotechnical personnel that the engineering firms' analysis of Dam 1 (which excluded all

laboratory data) complied with best practices.  *Id*. at ¶ 134.  Vale concealed all of this
information from Auditor B and instead allowed Auditor B to continue its reliance on the flawed
audit previously conducted by Auditor A.  *Id*. at ¶¶ 136-137.  Because of Vale's deceit, Auditor
B again issued a stability declaration and report for Dam 1 in March 2018 that Vale understood
to falsely declare that Dam 1's safety factor was 1.3.  *Id*. at ¶ 137.

### C.  Auditor C

Vale pressured Auditor C, the auditor who was conducting the periodic review due in
June 2018, to issue a stability declaration for Dam 1 despite the low safety factors and
unacceptable liquefaction risks.  *Id*. at ¶¶ 138-188.  In March 2018, for example, Vale's GRG
and operational geotechnical personnel met with Auditor C and Engineering Firm One to
demand "reassessment to be incorporated" into their analyses, including reassessing the
laboratory tests.  *Id*. at ¶ 133.  When Engineering Firm One refused, Vale removed it from
ongoing work on the project.  *Id*. at ¶¶ 135, 142.  By contrast, when Auditor C agreed to consider
additional tests, Vale's GRG and operational geotechnical personnel praised Auditor C's
"partnership" and willingness to "evolve" with Vale, and awarded them additional business.  *Id.*
at ¶¶ 141-145.

Then, when the additional tests still failed to move the safety factor to the 1.3 standard for
the peak, undrained condition, Vale pressured Auditor C to issue the DCE anyway, even though
both Vale and Auditor C knew the dam did not meet minimum safety standards.  *Id.* at ¶¶ 150-
169.  For example, in anticipation of a May 13, 2018 meeting, Auditor C's engineers complained
that "as always, Vale will throw us against the wall and state: if it doesn't pass, will you sign it or
not?"  *Id.* at ¶¶ 152-154.

Following a subsequent meeting with Vale, Auditor C's employees internally discussed the risk that Vale would not give them additional business if they did not issue the stability declaration. *Id.* at ¶¶ 150-158. On May 14, 2018, Auditor C engineers internally discussed their concern that Vale would use one particularly lucrative contract that Vale was considering them for as "blackmail" if they refused to issue the DCE. *Id.* at ¶¶ 150-157. Another Auditor C employee agreed, stating, "I agree that unless we sign the declaration we will certainly be left out of any future plans…." *Id.* at ¶ 158. And, after Executive One asked Auditor C if it would issue the DCE and Auditor C said it would—despite the critically low safety factors—Vale awarded Auditor C the contract. *Id.* at ¶¶ 156-160.

Because the additional tests that Auditor C considered still failed to move the safety factor beyond 1.09 for the peak, undrained condition, Vale and Auditor C moved the goal posts. *Id.* at ¶¶ 162-163. In May 2018, Auditor C falsely stated in the periodic review report that a safety factor of 1.05 or higher was sufficient to obtain a stability certification, which it then issued to Vale in June 2018. *Id.* at ¶¶ 163, 174. The next day, Vale signed and filed the false certification with Brazilian authorities. *Id.* at ¶ 174.

Eventually Auditor B learned of Auditor C's report, questioned the basis of the DCE given the low safety factors, and informed Vale that it could not timely certify Dam 1's safety without further analysis, so GRG employees simply removed Dam 1 from the scope of Auditor B's work. *Id.* at ¶¶ 182-83. Executive One approved the hiring of Auditor C on an emergency basis to conduct the state audit and federal semi-annual inspection that was due in September 2018, knowing Auditor C had just issued a positive stability declaration for Dam 1 in June, despite its failure to meet minimum safety guidelines. *Id.* at ¶¶ 187-88. Auditor C issued an additional false DCE in September 2018, which Vale filed with the relevant authority. *Id.*

10

Throughout this period, GRG personnel, including GRG Manager, Executive One, Executive Two, and Executive Three, knew at all times that the stability declarations it obtained were not reliable for assessing dam safety, and that Dam 1 was in fact a critical, high risk, and conditionally unsafe dam that posed an unacceptable risk of failure due to liquefaction and internal erosion.  *Id.* at ¶¶ 189-207.

## IV.    Vale's Materially False Statements to Investors

By obtaining illegitimate DCEs for Dam 1 in disregard of its low safety factors and non-compliance with international safety guidelines, and then touting the receipt of these DCEs to state all its dams were safe, Vale misled investors.  For example, Vale misleadingly stated in an October 6, 2016 investor presentation that its dams had been audited in 2016 to address the "potential for liquefaction," using a "rigorous" process that was "conservative" in modeling for liquefaction.  *Id.* at ¶ 222.  Vale also misleadingly claimed its "actions related to dam safety have been taken beyond the legislative requirements" and "[a]ll Vale's dams in the iron ore business are safe."  *Id.* at ¶¶ 222-226.  In its 2016 Form 20-F dated April 10, 2017, and its Form 6-K dated May 30, 2017, both of which were filed with the Commission, Vale misleadingly stated that it had "carried out extraordinary audits on the stability condition of our upstream dams, and no anomalies were identified."  *Id.* at ¶ 227.  Vale further misleadingly stated in its 2016 Sustainability Report issued on April 28, 2017, and made available to investors on its website, that in "2016, 145 dams were audited in the ferrous metals area, and the respective statements of stability conditions were filed within the deadline, in order to meet Vale's safety management requirements and legal parameters…."  *Id.* at ¶ 231.

Each of these statements were false and misleading because Vale omitted to state that reports received from May through October 2016 showed Dam 1 did not meet the minimum

11

recommended safety factors necessary to address the risk of liquefaction or have its stability certified.  Far from using a rigorous process or conservative methodology, Vale knew but omitted to state that it had secured the stability declarations for Dam 1 in connection with the extraordinary audit only by using flawed and unreliable data.  *Id.* at ¶¶ 231-233.

In its 2017 Sustainability Report issued on April 17, 2018, and made available to investors through its website, Vale continued its false narrative of safety, proclaiming that "all the structures in the Ferrous area are completely normal and stability-certified" because "100% of the audited structures were certified to be in stable condition" with stability declarations issued "by the responsible auditors."  Vale also falsely stated:

- "Vale maintains the management of its dams in permanent alignment and updating with the good and strictest international practices, standards of which exceed the legal requirements."

- "In addition to applying best practices pertaining to dam safety management, Vale submits its structures to audits conducted by specialized external consultants, and rigorously complies strictly with applicable legislation."

*Id.* at ¶ 237.

Yet again, each of these statements in the 2017 Sustainability Report was materially false and misleading because Vale omitted to state that it had not provided key information to its auditor, ensured its auditor relied on safety factors that were based on flawed laboratory data, and deliberately ignored best practices and international safety guidelines.  *Id.* at ¶¶ 237-244.  At the time of these statements, Vale was actively engaged in pressuring Auditor C to use flawed data and issue the DCE even though Dam 1 did not meet the 1.3 minimum safety factor for the peak, undrained condition and, therefore, could not be certified as stable or safe.  *Id.*

Vale also repeated these misstatements in its ESG Webinar published on its website on December 11, 2018.  *Id.* at ¶¶ 245-49.  In this webinar, Vale again misleadingly claimed that "[a]ll of Vale S.A.'s iron ore dams are safe and operating within normal limits" and "100%" of

its iron ore dams had been audited and received DCEs.  *Id*.  It also touted its use of external

experts to enhance Vale's dam safety risk management.  *Id*.  Vale omitted to state, however, that

it had obtained stability declarations for Dam 1 in 2018 by withholding material information

from its auditor that directly contradicted the audit results, ensuring its auditor used faulty data,

ignoring the external experts' recommendations for conducting liquefaction analyses,

disregarding minimum standards for dam safety, and replacing an auditor who questioned its

ability to issue a stability declaration given the low safety factors.  *Id.*  Vale similarly made

materially false and misleading statements when it touted in its Form 6-K filed with the

Commission on January 28, 2019, that it had received stability declarations for Dam 1 in June

and September 2018 and that Dam 1's safety factor was "in accordance with the world's best

practices and above the reference of the Brazilian Standard." *Id.* at ¶¶ 250-51.

Throughout the relevant period, the GRG Manager and Executives One, Two, and Three

were the underlying source of Vale's public statements concerning dam safety during the

relevant period.  These executives specifically had control over and responsibility for the

reporting of dam safety matters at Vale, certified the 2016 Form 20-F and 2016 Sustainability

Report, and reviewed the 2017 Sustainability Report.  *Id.* at ¶¶ 254-67.

## LEGAL STANDARDS

"To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009) (quotation marks omitted).  "A claim has facial plausibility when the

plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Id.*  "A court must construe the complaint

liberally, accept all factual allegations in the complaint as true, and draw all reasonable

inferences in the nonmovant's favor." *U.S. Commodity Futures Trading Comm'n v. Wilson*, 27 F. Supp. 3d 517, 531 (S.D.N.Y. 2014) (*citing Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir.2002).  "[A] defendant cannot defeat a claim by pointing to facts that are omitted if the allegations as pled meet the requisite standard." *S.E.C. v. Collins & Aikman Corp.*, 524 F. Supp. 2d 477, 493 (S.D.N.Y.  2007).

Federal Rule of Civil Procedure 9(b) provides that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake," but "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).  While Rule 9(b) "demands specificity … it does not demand that a plaintiff plead every fact that forms the alleged violations," *Collins & Aikman*, 524 F. Supp. 2d at 493, and "does not require that a complaint plead fraud with the detail of a desk calendar or a street map." *KCG Americas LLC v. Brazilmed LLC*, 15-CV-4600 (AT), 2016 WL 900396, at *3 (S.D.N.Y. Feb. 26, 2016) (citations omitted).  In this case, the Complaint has satisfied Rule 9(b), because it "set[s] forth the who, what, when, where and how of the alleged fraud." *Cognex Corp. v. Microscan Sys., Inc.*, 990 F. Supp. 2d 408, 418 (S.D.N.Y. 2013) (*quoting Exergen Corp. v. Wal–Mart Stores, Inc.*, 575 F.3d 1312, 1327 (Fed. Cir. 2009).

## ARGUMENT

Over a multiple year period, with the knowledge and participation of the GRG manager and Executives One, Two, and Three, Vale accepted, signed and filed DCEs it knew were based on unreliable data; pressured auditors to use that unreliable data; removed auditors who refused to play ball; and used the promise of additional work to persuade at least one auditor to compromise its standards.  Over a similar period, and again with the knowledge and participation of the GRG Manager and Executives One, Two, and Three, Vale made multiple false and

misleading statements to investors about the safety of its dams.  Those misrepresentations were material.  Especially after a separate catastrophic collapse in 2015 due to liquefaction, dam safety, the integrity of Vale's dam safety audit process, and the safety of a "high damage potential" dam like Dam 1, were all material to Vale's investors.  And these misrepresentations were made with scienter.  The GRG Manager and Executives One, Two, Three, and Four knew or were reckless in not knowing that Dam 1 did not meet minimum safety standards and was at an unacceptable risk of collapse due to liquefaction.

In its motion to dismiss, Vales misconstrues the allegations against it, the underlying documents cited in the Complaint, the legal standards applicable at the pleading stage, and the substantive case law.  The Court should deny Vale's motion in its entirety.

## I.  THE COMPLAINT ADEQUATELY ALLEGES VALE'S SCIENTER

### A.  The Complaint Adequately Alleges a Strong Inference of Scienter

A plaintiff may establish the requisite scienter under the securities laws by alleging facts showing either: (a) motive and opportunity to commit fraud, or (b) "strong circumstantial evidence of conscious misbehavior or recklessness."  *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000) (citations omitted).  Intentional misconduct "encompasses deliberate illegal behavior," and reckless conduct is "highly unreasonable conduct which represents an extreme departure from the standard of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendants must have been aware of it."  *Id*. at 308 (citations omitted).  A complaint should survive a 12(b)(6) motion if "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).  At the pleadings stage, the determination of whether the Complaint

meets the requirements for pleading scienter should be left to the fact-finder, even if the

Complaint's allegations regarding scienter are "fairly tenuous." *S.E.C. v. One or More*

*Unknown Traders in Sec. of Onyx Pharms. Inc.*, No. 13-CV-4645 (JPO), 2014 WL 5026153, at

*4 (S.D.N.Y. Sept. 29, 2014) (citations omitted).

### 1. Vale's Argument, That Documents Incorporated in the Complaint Show that Dam 1 Appeared Stable, Does Not Negate the Strong Circumstantial Evidence of Scienter

To rebut the SEC's extensive factual allegations detailing Vale's understanding that

Dam 1 posed an intolerably high risk of collapse due to its unacceptably low safety factor, Vale

argues that documents incorporated by reference in the Complaint show that "Dam 1 appeared

stable until its collapse and thus was not believed to have an unacceptable probability of

failure." Mot., 19. Vale claims that "the very documents cited and relied on by the SEC in the

Complaint concluded that Dam 1 appeared stable," *id.* at 1, a conclusory factual interpretation

contrary to the specific allegations detailed in the Complaint. Vale's gloss on the underlying

documents is misleading and should be rejected. The Court cannot, at this stage and without

the benefit of any witness testimony, conclude that the underlying documents establish as a

matter of law that Vale did not act with scienter.

As an initial matter, Vale's argument that Dam 1 appeared to be stable is inapposite.

The SEC's allegations do not rest upon whether the dam "appeared stable" but rather on

whether Dam 1 failed to meet the relevant, internationally accepted safety factors and posed an

unacceptable risk of collapse. The Court should reject Vale's attempt to inject a new standard,

the outward "appearance of stability," into its analysis because it is not relevant to the SEC's

allegations. *See, e.g., Collins & Aikman Corp.*, 524 F. Supp. 2d at 493 ("a defendant cannot

defeat a claim by pointing to facts that are omitted if the allegations as pled meet the requisite

standard."). Similarly, Vale's contentions that reports reflect that the dam was "becoming safer over time" and that there was only a "remote" chance of the dam failing due to liquefaction, Mot., 21-22, even if true, do not negate the SEC's allegations that Vale knew the dam still was never safe enough to meet minimum safety standards. *Collins & Aikman Corp.*, 524 F. Supp. 2d at 493. In this context, and as pled in the Complaint, even a remote risk of failure was still unacceptably unsafe. *See* Compl., ¶ 53 (maximum acceptable risk of collapse was less than $1x10^{-4}$, or less than once in 10,000 years, and Dam 1 exceeded this risk level).

The Complaint alleges that "Vale knew that the assessments of the Brumadinho dam, based on best engineering practices, had revealed that the dam did not even meet Vale's own safety standards much less international standards for dam safety." *Id.* at ¶¶ 35-36 (Vale, its auditors, and its retained experts all adopted 1.3 as the minimum safety factor for the peak, undrained condition); ¶¶ 51, 65, 100, 103, 109, 116, 129, 132, 162, 168 (instances in which Vale received reports or draft reports indicating the dam did not meet this standard). Vale attempts to recast *some* of the documents cited in the Complaint—specifically the audit reports, the Post-Collapse Report,[4] and the PIESEM reports—to support the irrelevant notion that Dam 1 "appeared to be stable until its collapse." Mot., 19-23. Vale's reliance on these documents is misplaced, and its argument is a red herring.

---

[4] Vale repeatedly cites what it called the "Post-Collapse Report," but fails to mention the "Executive Summary of the Independent Investigation Report" detailed in the Complaint at ¶¶ 217-218, which also was prepared post-collapse. Conway Decl., Ex. 1. Of these two reports commissioned by Vale, the Executive Summary of the Independent Investigation Report had the broader scope, covering both technical and non-technical factors relevant to the rupture of Dam 1. *Id.* at 6. In contrast, the scope of the Post-Collapse Report was limited to technical factors. *Id.* at 12 n.20. Only the Independent Investigation Report assessed Vale's risk management processes, controls, and governance related to Dam 1. *See, e.g.*, *id.* at 7, 33-40.

First, the Complaint alleges that Vale manipulated the audit process and that Vale knew the audit reports' conclusions were unreliable, as discussed in more detail below.  Compl., ¶ 13, 221.  As the Court found in the related class action, which also alleged improper interference with audits:

> Vale's assertion that audit reports refute an inference of scienter is unpersuasive.  The cases Vale cites suggest good faith reliance on reports.  *See, e.g., Foley v. Transocean Ltd.*, 861 F. Supp. 2d 197, 219 (S.D.N.Y. 2012) (finding certification that a rig was in safe condition following an audit undermined claim that defendant was aware of equipment issue prior to a blowout).  By contrast, Defendants' allegedly improper interference with audits and the auditor's conflict of interest undermines the claim that DCEs provided independent assurances.

*In re Vale S.A. Sec. Litig.*, No. 19-CV-526 (RJD) (SJB), 2020 WL 2610979, at *17 (E.D.N.Y. May 20, 2020) (the "Class Action").  Vale fails to address the numerous emails, text messages, reports, and other documents cited in the Complaint that show how Vale interfered with the audit process and understood that the safety factors stated in the DCEs were false.  Compl., ¶¶ 47-207.

Second*,* regarding the Post-Collapse Report, Vale argues the Report's conclusion that the dam had "no apparent signs of distress prior to failure" shows a lack of scienter.  Mot., 19.  But the SEC does not allege scienter based on outwardly visible signs of distress.  It alleges scienter based on Vale's executives' knowledge that the dam did not meet internationally accepted safety standards, including the minimum safety factor for the peak, undrained condition and their manipulation of the audit process.  The Post-Collapse Report is silent on these issues and therefore unhelpful to Vale's cause at this stage.

Third, none of the PIESEM reports concluded that the dam met the relevant safety factors.  Park Decl., Exs. 15, 21.  To the contrary, the third PIESEM report noted that the safety factor for the dam was "on the order of 1.1."  Park Decl., Ex. 21, p. 20.  Vale notes that this

report recommended against any immediate corrective action at the dam, Mot., 20, but that recommendation does not suggest the panel believed that Dam 1 was stable.  To the contrary, the PIESEM recommendation reflected the panel's concern that any immediate action at the dam could precipitate its collapse.  Park Decl., Ex. 21, 21-22 (recommending that Vale continue its efforts to reduce the water level in the dam and then assess whether it could safely implement additional remedial measures).  In other words, the dam was too fragile and unstable to risk attempting any corrective action that might accidentally trigger liquefaction.

### 2.   The SEC Adequately Alleges That Vale Concealed Information From or Improperly Pressured Auditors and Experts

Vale argues that the Complaint fails to properly allege that Vale pressured Auditor A to include unreliable lab data, withheld information from Auditor B, or pressured Auditor C to issue an improper DCE.  Mot., 24-28. The Complaint, however, alleges all of these facts in detail.

### a.   The Complaint Alleges That Vale Acted in Concert With Auditor A to Include Unreliable Lab Data

The Complaint alleges that Auditor A disregarded the recommendation of the Liquefaction Expert to exclude the unreliable laboratory tests from its analysis, thus compromising the integrity of its DCE.  Compl., ¶ 79.  Vale, however, asserts that Auditor A's report reflects its "genuine beliefs," and that the disagreement between Auditor A and the Liquefaction Expert were "good faith differences of opinion among experts."  Mot., 24.

Vale's assertion of Auditor A's good faith is just that—an assertion.  The facts alleged in the Complaint do not support the inference that Auditor A acted in good faith.  The Liquefaction Expert explained to both Vale and Auditor A why the laboratory data for Dam 1 was unreliable. Compl., ¶¶ 58, 64, 73.  Auditor A justified its use of the laboratory data by adopting a methodology developed by the Liquefaction Expert for a different dam with different data characteristics.  *Id.* at ¶ 79.  It offered no explanation for why it used an unsuitable methodology

19

over the Liquefaction Expert's specific advice based on the actual characteristics of Dam 1's laboratory data.  At this stage, the Court must draw the inference that Auditor A used the laboratory data despite knowing it was unreliable, as alleged in the Complaint.

Vale further argues that there are "no plausible allegations" that Vale influenced Auditor A's failure to adopt the Liquefaction Expert's recommendations.  Mot., 24.  But the Complaint alleges that Vale initially requested the Liquefaction Expert serve as Auditor A's consultant and instructed Auditor A to follow the Liquefaction Expert's methods.  Compl., ¶¶ 49-50.  Then, when it became apparent that following the Liquefaction Expert's methods would yield unsatisfactory results, Vale accepted Auditor A's report prepared in contravention of the Liquefaction Expert's recommendations and submitted it to Brazilian regulators.  *Id.* at ¶¶ 78-82.  Vale knew the audit was flawed but accepted and touted its results anyway.  The improper manipulation of the audit process, as detailed in the Complaint is a contested fact, and the factual inference posited in the Complaint should prevail.  *Wilson*, 27 F. Supp. 3d at 531.  Similarly, the determination of Auditor A's "genuine belief" and "good faith" is a contested fact that should be evaluated by the fact-finder, not in the context of a 12(b)(6) motion.  *Id.*

### b. The Complaint Alleges That Vale Withheld Information From Auditor B, and Documents Referenced by Vale Do Not Show Otherwise

The SEC alleges that "Vale deliberately withheld from Auditor B the Brumadinho dam's true, 1.06 safety factor" and deliberatively concealed from Auditor B that "the dam's condition required immediate remedial measures" and that "the firms conducting the failure probability analysis and Periodic Review found that all laboratory data for the Brumadinho dam was unreliable."  Compl., ¶ 125.

Contrary to Vale's assertions, the Complaint's allegations are not conclusory but rather contain particularized facts of Vale's concealment—the who, what, when, where, why and how.

Mot., 26.  Vale (the "who") concealed Dam 1's 1.06 safety factor (a figure well below the requisite 1.3 safety factor), that the dam required immediate remedial measures, and that expert firms assessing the dam's risk of failure found that all laboratory data was unreliable (the "what") during the period immediately preceding the issuance of Auditor B's September 13, 2017 report (the "when"), including during the performance of Auditor B's work at Dam 1 in Minas Gerais, Brazil (the "where") in order to obtain the DCE (the "why") by withholding reports and information from Auditor B (the "how").  Compl., ¶¶ 83-98.

Furthermore, documents cited by Vale do not contradict the Complaint's allegations. Vale does not offer any citations to support its assertion that Auditor B was informed of the unacceptably low safety factor assessed with respect to Dam 1.  Vale claims that Auditor A's Liquefaction Studies Report references the Liquefaction Expert's assessment of the lab data, Mot., 26, but Auditor A's Liquefaction Studies Report states merely that the Liquefaction Expert thought that *some* of the laboratory data was unreliable.  Park Decl., Ex. 19.  It does not explain the Liquefaction Expert's rationale, nor does it explain that the Liquefaction Expert thought *all* of the field data should be ignored, as alleged in the Complaint.  Compl., ¶ 58.

Vale's assertion that Engineering Firm One's PIESEM Presentation shows that Auditor B was made aware of the unreliability of the laboratory data is equally unsupported.  Mot., 26; Park Decl., Ex. 24.  The face of the cited document does not show that Auditor B attended the session where Engineering Firm One presented, or that Auditor B received Engineering Firm One's Presentation.  Park Decl., Ex. 24.  And the PIESEM Report issued after Engineering Firm One's Presentation does not indicate who, other than panel members, was provided with the contents. Park Decl. Ex. 15.  The Court should not infer from these documents that Auditor B learned any

relevant information through the second PIESEM meeting, especially when the Complaint specifically alleges the opposite.  *See* Compl., ¶ 108.

Finally, Auditor B's reaction, after it learned that Auditor C concluded that the safety factor was for the peak, undrained condition was 1.09, supports the inference that Auditor B was previously in the dark about the true state of Dam 1.  Compl., ¶¶ 180-183.  "Alarmed" by Auditor C's conclusions, Auditor B questioned whether it could issue subsequent DCEs, as it was initially hired to do.  *Id.* at ¶ 182.  Vale responded by removing Auditor B from further work on Dam 1.  *Id.* at ¶ 183.  That episode supports the inference that until June 2018, after it had issued three DCEs for Dam 1, Auditor B did not understand that Auditor A's work, on which Auditor B relied, used data that other auditors and experts considered unreliable in a way that artificially inflated the safety factor.  Ultimately, whether Vale provided all pertinent information to Auditor B is a contested fact, and as with the other contested facts detailed above, the SEC is entitled to the inference that its factual allegations are true at this stage in the proceeding.  *Wilson*, 27 F. Supp. 3d at 531.

### c.  The Complaint Alleges That Vale Pressured Auditor C

The SEC alleges that Vale improperly pressured Auditor C to issue a DCE.  Compl., ¶¶ 138-160.  Vale argues that the Complaint's allegations detailing email exchanges among Auditor C employees and discussions and meetings between Vale's GRG personnel, including Executive One, and Auditor C employees regarding pressure to issue the DCE despite knowing that Dam 1's low safety factors precluded its proper issuance, are somehow insufficient.  Mot., 28.  Vale's baseless view on the sufficiency and persuasiveness of the facts alleged is not controlling.  *Id*. 27-28; *Wilson*, 27 F. Supp. 3d at 531.  A fact finder must decide this issue.

Vale also argues in passing that Auditor C's awareness of the Liquefaction Expert's recommendation to exclude the laboratory data somehow undercuts the Complaint's allegations

that Vale deliberately concealed the Liquefaction Expert's recommendations "from anyone." Mot., 27-28.  It does not.  Not only is Vale's argument overreaching, it improperly ignores how differently situated Auditor C was given its work on both the periodic review and the dam rupture probability analysis, as compared to Auditor B, who was conducting a more limited semi-annual audit and fully dependent on the information Vale provided to it.  Compl., ¶ 90.

Finally, contrasting Auditor C's draft audit reports to the final version issued to Vale and filed with the relevant authorities in June 2018 exemplifies how Vale pressured Auditor C, and how Auditor C caved to the pressure.  In response to Auditor C's March 2018 draft report concluding that Dam 1 had a "critically low 1.06 safety factor in the undrained condition" that "was below the recommended minimums" and required "geotechnical interventions," Vale personnel "disagreed with Auditor C's 'very conservative approach'" and demanded that Auditor C "reassess" its review and "submit a revised report."  *Id.* at ¶¶ 132-133, 146-147.  In response to the pressure, Auditor C revised its report based on "reinterpretation" of field data, and presented an increased safety factor of 1.09 and a false, lowered reference safety factor of 1.05 (as opposed to the previously agreed-upon 1.3).  *Id.* at ¶¶ 162-163.[5]  Auditor C then issued a positive DCE in June based on the reassessment and revisions Vale had demanded.  *Id.* at ¶¶ 170, 174.

### 3. The SEC Adequately Alleges That Vale Improperly Removed Auditors

With respect to the Complaint's allegations that Vale improperly removed auditors, Vale again argues that the Complaint is conclusory, this time by failing to allege the "who and where" of Vale's removal of Engineering Firm One from its work on the June 2018 safety audit.  Mot., 28.  The Complaint, however, does allege the "who"—Vale; it also alleges the "where"—

---

[5] Auditor C was well aware that the reference safety factor should have been 1.3 at that time, as demonstrated by its inclusion of the 1.3 standard in a separate report it prepared for Vale—the Dam Rupture Probability Analysis.  *Id.* at ¶ 166.

Engineering Firm One performed the relevant work in Minas Gerais, Brazil, at the location of

Dam 1. *See, e.g., Collins & Aikman Corp*., 524 F. Supp. 2d at 493.

Next, Vale relies on contested facts when it argues that Engineering Firm One could not

have been removed because it did not have responsibility for the audit. Mot., 28-29. The

Complaint clearly alleges, however, that both Engineering Firm One and Auditor C had

responsibility for the audit. Compl., ¶ 89. Contested facts should be left to the post-pleadings

fact-finder for determination. *Wilson*, 27 F. Supp. 3d at 531.

Vale argues that removing Engineering Firm One was "pointless" because Auditor C's

report ultimately disregarded the laboratory data. Mot., 29. But Engineering Firm One was

removed because it would not reassess its work, whereas Auditor C did agree to reinterpret the

field data as it "evolved." Compl., ¶¶ 133-135, 162-163. When the reinterpreted data still only

supported a safety factor of 1.09, Vale successfully pressured Auditor C to compromise its

analysis further by adopting a reference safety factor of 1.05. *Id*. at ¶¶ 138-179. Thus, while

Vale punished Engineering Firm One because it would not yield to Vale's demands, it rewarded

Auditor C, who ultimately gave Vale the positive DCE it sought. *Id*.

As to the Complaint's allegations that Vale replaced Auditor B with Auditor C to obtain a

false stability declaration, Vale argues that the Complaint lacks specificity by not identifying the

"who" and "when" of the replacement allegation. Mot., 29. Here, the "who" is Vale, and the

"when" is during the time of the preparation of the September 2018 audit. Compl., ¶¶ 179-188.

Finally, Vale's argument that the Complaint's pleading is inadequate because of the

existence of an alternative explanation for why Vale replaced Auditor B with Auditor C, because

of Auditor B's lack of commitment to complete the audit by the regulatory deadline, Mot., 29,

erroneously isolates and de-contextualizes this particular fact from the rest of the facts alleged in

24

the Complaint.  The Complaint, however, alleges numerous facts that, taken together, demonstrate Vale's continued efforts to improperly manipulate the audit process.  Compl., ¶¶ 179-188.  In any event, it is the responsibility of the factfinder to weigh the plausibility of any alternative explanations regarding the removal of Auditor B.  *Wilson*, 27 F. Supp. 3d at 531.

**B.  The Complaint Adequately Alleges Motive and Opportunity**

To show motive and opportunity, a plaintiff must "allege a likelihood that [the defendant] could realize 'concrete benefits'" through the fraud.  *S.E.C. v. O'Rourke*, 19-CV-4137 (KAM)(PK), 2019 WL 8325092, at *2 (E.D.N.Y. April 14, 2019) (citations omitted).  Where a corporation is alleged to have engaged in fraudulent conduct, a plaintiff satisfies its pleading burden by alleging the particular benefit the corporation would reap as a result of its fraud, something beyond a generic desire to appear profitable.  *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 81–82 & n. 67 (2d Cir. 2021) (reversing district court and holding that plaintiff pled motive and opportunity by specifically alleging how defendant stood to profit from its manipulative conduct).

The Complaint meets this standard.  Vale's argues that, because Dam 1 "had been inactive since 2016 and had no impact on Vale's mining operations," Vale would have no motive to engage in the alleged fraud. Mot., 17-18.  But the Complaint alleges that Vale continued to reap the concrete benefit of the output from Dam 1's nearby mine and that publicly acknowledging the dam's safety issues would have meant immediately closing that mine. Compl., ¶¶ 152, 275.  Furthermore, the Complaint alleges that Vale was motivated to postpone remediation not only to avoid incurring significant remediation costs, but also to avoid triggering a collapse, which would have catastrophic consequences.  *Id*. at ¶¶ 16, 129, 173, 230-241, 275. Because Vale's fraud allowed it to keep the mine operational and to delay enormous remediation

costs, it realized concrete benefits, and the SEC has alleged motive and opportunity.  *See Set Cap.*, 996 F. 3d at 81–82.

### C.  The Complaint Alleges Scienter Imputable To Vale

The SEC's Complaint alleges a strong inference of scienter imputable to Vale based on the actions of senior leadership and senior managers directly responsible for risk management in its Iron Ore Division and hence the risk assessment-related disclosures central to the Complaint.  In arguing that the SEC's Complaint does not identify any employees to whom Vale's scienter could be imputed, Vale ignores the Complaint's allegations against the senior-most executive and improperly classifies the other executives as "junior," an assertion that at best raises a factual dispute.

To adequately plead scienter, a complaint must plead facts that "create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *In re Chembio Diagnostics, Inc.*, 586 F. Supp. 3d 199, 222 (E.D.N.Y. 2022) (quoting *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Cap., Inc.*, 531 F.3d 190, 195 (2d Cir. 2008)). The intent of senior management can be imputed to a company.  *In re Vale S.A. Sec. Litig.*, 2020 WL 2610979, at *17; s*ee also In re Tenaris S.A. Sec. Litig.,* 493 F. Supp. 3d 143, 164 (E.D.N.Y. 2020) ("[c]ourts routinely impute to the corporation the intent of officers and directors acting within the scope of their authority") (citations omitted).  Outside of senior management, the intent of other employees can be imputed to a company if those employees "had direct involvement in the aspect of the business at issue or the company's disclosure functions." *Barrett v. PJT Partners Inc.*, No. 16-CV-2841 (VEC), 2017 WL 3995606, at *7 (S.D.N.Y. Sept. 8, 2017) (citing, e.g., *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 408-09 (S.D.N.Y. 2016) (imputing knowledge of employees "at the center" of the illegal scheme); *In re MBIA, Inc.*

*Sec. Litig.*, 700 F. Supp. 2d 566, 590-91 (S.D.N.Y. 2010) (imputing knowledge of unit heads who spoke directly to the market)).

The SEC's Complaint alleges scienter based on the actions of five employees, all of whom were *senior management or executives* with responsibility for the Iron Ore Division's risk assessment related to Dam 1.  The senior-most employee included in the Complaint's scienter allegations, Executive Four, reported directly to the Vale CEO and was a member of Vale's Executive Board, Compl., ¶¶ 40, 44, and should therefore be considered to be senior management with scienter imputable to Vale.  *See In re Marsh & McLennan Cos. Sec. Litig.*, 501 F. Supp. 2d 452, 481 (S.D.N.Y. 2006) ("While there is no simple formula for how senior an employee must be in order to serve as a proxy for corporate scienter, courts have readily attributed the scienter of management-level employees to corporate defendants.") (citations omitted).  In its Motion, Vale failed to present an argument as to why Executive Four's knowledge and actions should not be imputed to Vale with respect to Vale's 2016 Form 20-F and its Form 6-K dated May 30, 2017.  Mot., 30-32; Compl., ¶ 230.

All of the other senior executives discussed in the Complaint, Executives One, Two, and Three, and the GRG Manager, managed the audits and dam safety risks, Compl., ¶ 43, demonstrating their "direct involvement in the . . . business at issue"—namely, safety risk assessment.  *See Barrett*, 2017 WL 3995606, at *7.  In addition, Executives Two and Three each reported directly to Executive Four, a member of senior management, and, importantly, *each was responsible for SOX sub-certifications*, and therefore responsible for Vale's reporting and risk assessment-related disclosures covering Dam 1.  Compl., ¶ 44.  Their scienter is thus imputable to Vale.  *See Barrett*, 2017 WL 3995606, at *7.

Similarly, Executive One, who had overarching responsibility for managing dam safety risks for the entire Iron Ore Division, was also responsible for SOX sub-certifications, Compl., ¶ 44, demonstrating his key role in Vale's reporting and risk assessment-related disclosures covering Dam 1 and making his scienter imputable to Vale.  In addition, Executive One was a member of the Operational Risk Subcommittee under the Executive Risk Committee and the Geotechnical Leadership Committee, which was specifically responsible for managing Vale's dam risks.  *Id.*  His membership in these committees further demonstrates his management responsibilities related to Dam 1's risk assessments.

The GRG Manager's scienter is also imputable to Vale because of her risk management responsibilities as member of the Geotechnical Leadership Committee.  *Id.* at ¶ 42.  The Complaint also details how the GRG Manager and Executive One had specific responsibility for certifying the effective operation of dam safety internal controls, *id.*, which further demonstrates her direct involvement in dam safety risk assessment.  *See Barrett*, WL 3995606 at *7.

## II.  VALE'S MISREPRESENTATIONS TO INVESTORS IN OCTOBER 2016 AND IN ITS 2018 ESG WEBINAR ARE ACTIONABLE

Vale dedicates over five pages of its brief attacking isolated misrepresentations alleged in two paragraphs of the Complaint.  Mot., 32-38 (discussing misrepresentations addressed at Compl., ¶¶ 222 and 245).  Vale's arguments are meritless, and in some instances the Court has previously held that the challenged misrepresentations are actionable.

### A.  The Complaint Adequately Pleads Falsity With Respect to the October 16, 2016 Investor Presentation

Vale incorrectly claims that the SEC "does not provide a factual basis for the bare falsity allegation" related to two sub-parts of the misstatements alleged in ¶ 222 of the Complaint— specifically that Vale's 2016 safety audits incorporated new regulations requiring analysis on the

28

undrained condition, and incorporated learnings related to the accident of the Fundão dam.  Mot.,

33.  As alleged in the Complaint, Vale's auditor ignored good engineering practices when

calculating the safety factor for the undrained condition, and thus Vale's 2016 safety audits did

not comply with legislative requirements.  Compl., ¶ 223. Similarly, by manipulating the audit

process to achieve an artificially high safety factor for the undrained condition, Vale did not

incorporate its key learning from the Fundão collapse that "the undrained condition—which

assessed the dam's ability to withstand liquefaction failure—was the most important and relevant

aspect of the stability analysis." *Id.* at ¶ 190.

Vale argues that the SEC's allegation regarding "incorporated new regulations" is

contradicted by minutes from an October 6, 2016 investor presentation.  Mot., 33; Park Decl. Ex.

25 (Vale's memo incorrectly refers to this document as Ex. 24).  But this document merely states

on its face that the 2016 audits purportedly incorporated the new legislative changes.  Park Decl.

Ex. 25 at p. 3.  It does not contradict the SEC's allegation that, in fact, the audit did not comply

with the new regulations.  In short, the falsity of the statements contained in ¶ 222 raise questions

of disputed fact that cannot be decided at the pleading stage.

### B.  The Statements in the 2018 ESG Webinar, When Placed in Context, Are False or Misleading

Vale argues that false statements contained in its 2018 ESG Webinar are not actionable.

Specifically, Vale characterizes the following statements as *literally* truthful: (1) its "iron ore

tailings dams were audited" and (2) when implementing "regulatory compliance" it "work[ed]

proactively with complementary processes and initiatives."  Mot., 33.  These statements,

however, "must be construed in 'context'" and, when done so, are plainly misleading.  *Altayyar*

*v. Etsy, Inc.*, 242 F. Supp. 3d 161, 174 (E.D.N.Y. 2017) (internal citations omitted).

As Vale knew, especially after the Mariana disaster, dam safety was of utmost importance to investors.  Compl., ¶ 9.  Here, Vale affirmatively told the market that its iron ore dams were "audited."  In the context of the applicable regulatory regime and Vale's own statements regarding its audit practices, the concept of an audit was both "quantifiable [and] factual" and not subject to interpretation.  *See Altayyar*, 242 F. Supp. 3d at 174.  When Vale told the market that its dams were audited in 2018 that statement conveyed a specific meaning and importance, namely that positive DCE's had been properly obtained and were reliable. Compl., ¶¶ 239-249.

The SEC has alleged, however, that the audit process for Vale's dams was corrupted.  *Id.* at ¶¶ 246-248.  It was therefore highly misleading to lull the market into complacency by assuring it that an independent audit was performed without also sharing the fact the DCEs were obtained through coercion and not in conformance with best engineering practices.  *Id.* at ¶¶ 47-188.  This is much more than merely a "subjective disagreement with the outcome of those processes…."  Mot., 34.  Indeed, as the court held in the Class Action, misstatements regarding DCEs were actionable:

> These statements represent that Vale's dams were deemed safe and subject to reliable third-party audits. Vale's omission of alleged facts suggesting that there were known issues with dams and that *DCEs were unduly influenced and certified for dams with insufficient factors of safety* obviously *paint an incomplete and misleading picture* about the stability of Vale dams.

*In re Vale S.A. Sec. Litig.*, 2020 WL 2610979, at *14 (emphasis added).

Finally, Vale deconstructs ¶ 245 of the Complaint and extracts two clauses and then declares them to be inactionable because they were only "listing applicable legal requirements." Mot., 34.  This confined reading of the Complaint, however, misses the point.  Vale's claim that it was in compliance with "legal obligations" relating to safety audits was highly misleading and

incomplete because it had procured the legally required DCEs by fraudulent means and knew

they did not adequately reflect the true risk of liquefaction posed by Dam 1.  Compl., ¶¶ 246-

249.  These were not simply "[g]eneral statements about Vale's dams or risk management

protocols" but instead were specific and actionable misstatements.  *See In re Vale S.A. Sec.

Litig.*, 2020 WL 2610979, at *13-14.  Accordingly, Vale's argument that the Complaint fails to

state a claim is meritless.

### C.  Vale's Other Misstatements Are Not Inactionable Statements of Opinion

Relying heavily on the Supreme Court's decision in *Omnicare, Inc. v. Laborers Dist.*

*Council Const. Indus. Pension Fund*, 575 U.S. 175, 188 (2015), Vale endeavors to shield itself

from liability for certain of its misrepresentations by claiming that they  were merely "subjective

opinions" and therefore only actionable in three circumstances: (1) "the speaker did not hold the

belief she professed," (2) "the supporting facts she supplied were untrue," or (3) "the speaker

omit[ted] information whose omission makes the statement misleading to a reasonable investor."

Mot., 35 (*quoting Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016).  As discussed below, the

specific misrepresentations Vale cites fall into the first or third of these categories.

Vale argues that it cannot be liable for characterizing its audit process as "conservative"

or "rigorous" based on four unsubstantiated reasons contained in an investor presentation.  Mot.,

36.  But simply listing these "four reasons" does not settle the dispute because the Complaint

alleges precisely *why* Vale's process was neither conservative nor rigorous.  The Complaint

alleges, among other things, that Vale deliberately flouted the Liquefaction Expert's guidance on

the use of unreliable laboratory data and rejected good engineering practices in order to

improperly obtain DCEs.  Compl., ¶¶ 223-26.  Vale's characterization of its audit process as

"conservative" and "rigorous" (when Vale knew that it was based on flawed laboratory data and

31

that the use of only reliable field data would reveal an unacceptably low safety factor) was either insincere or misleading because of facts Vale omitted to disclose. *See Omnicare*, 575 U.S. at 189 (a reasonable investor "expects not just that the issuer believes the opinion (however irrationally), but that it fairly aligns with the information in the issuer's possession at the time"); *see also Fed. Hous. Fin. Agency v. Nomura Holding America, Inc.*, 104 F. Supp. 3d 441, 566 (S.D.N.Y. 2015) (defendants found liable when "statements of belief implied that defendants knew 'facts sufficient to justify' forming the opinion they expressed…. [and] defendants were aware of information contradicting the representations in the Supplements…."); *S.E.C. v. RPM Int'l., Inc.*, 282 F. Supp. 3d 1, 19 (D.D.C. 2017) ("The facts alleged in the complaint about what was known to Moore and RPM but omitted from the filings would render the statements misleading to a reasonable reader.").

Vale next argues that it cannot be liable for touting that its audit process "incorporat[ed] the vision of good practice in the world," *i.e.*, conformed to best engineering practices, because 1) an opinion is not misleading just because the speaker knows "some facts" cutting against its conclusion, and 2) the Liquefaction Expert's rejection of the laboratory data as itself a mere "view" that "is not even a fact, just an opinion." Mot., 36-37. But, as Vale knew, the Liquefaction Expert's conclusion that the lab data was unreliable was based on his scientific analysis, not a mere opinion about its quality. Compl., ¶ 64. Auditor A's use of the lab data, by contrast, was supported only the application of an inapposite methodology developed by the Liquefaction Expert for a different dam with different data characteristics. *Id.* at ¶ 79. Vale was not merely aware of "some facts" indicating that Auditor A did not employ best engineering practices. It knew that the Liquefaction Expert had a scientific basis for rejecting the laboratory data as unreliable, and that there was no valid argument for including the laboratory data.

32

Here, Vale's so-called opinions do not fairly align with what it knew concerning the integrity of the audit process, the end-run around the advice of outside experts, and the lack of adherence to good engineering practices.  Compl., ¶¶ 227-253.  As noted by the Supreme Court in *Omnicare*:

> An issuer must as well desist from misleading investors by saying one thing and holding back another.  Omnicare would nullify that statutory requirement for all sentences starting with the phrases "we believe" or "we think."  But those magic words can preface nearly any conclusion, and the resulting statements, as we have shown, remain perfectly capable of misleading investors.  Thus, Omnicare's view would punch a hole in the statute for half-truths in the form of opinion statements.

575 U.S. at 192-93 (citations omitted).  Accordingly, it would be inappropriate to dismiss the SEC's Complaint at this stage because there are abundant misleading and omitted facts that could be "viewed by the reasonable investor as having significantly altered the total mix of information made available."  *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988).[6]

## D.  None of Vale's Misstatements Can be Properly Described as Puffery as They Are Not Vague or Self-Congratulatory Statements.

Despite telling the Court that Vale "does not seek to relitigate" its prior rulings, Mot., 1, Vale has in fact done the opposite.  In the Class Action, the Court has already held that statements about safety are not "puffery":

> While Vale's statements about safety and sustainability may be generic, because it repeatedly emphasized its commitment to such priorities, Vale 'put the topic at issue such that [the Court] cannot say that, as a matter of law, investors would not find [certain] representations material.'

*In re Vale S.A. Sec. Litig.*, 2020 WL 2610979, at *12 (internal citations omitted).

---

[6] The Complaint is replete with specific allegations concerning the manipulation of Vale's audit process.  Compl., ¶¶ 47-188.  There are also allegations that Vale knew that their public statements omitted or misrepresented facts and were not simply good faith opinions.  *See id.*  Accordingly, the facts here are distinguishable from those in the cases relied upon by Vale in which the plaintiff did not plead with similar precision.  *See, e.g., Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 355 (2d Cir. 2022).

Notwithstanding its contradictory statement, Vale seeks to have dismissed as "puffery" two statements related to dam safety that go the core of the SEC's Complaint: (1) "all of its 'dams in the Iron Ore Business are safe'" and (2) "the panels of national and international experts are of great importance and contribute by . . . acting as consultants on safety issues." Mot., 37, Compl., ¶¶ 222 & 245.[7]  These statements, however, are far more than only qualified "aspirational" declarations or "soft adjectives." *See, e.g., In re Vale S.A. Sec. Litig.,* 2020 WL 2610979, at *10 ("While Vale's allegedly misleading statements about dam conditions rely on adjectives that may be vague in other circumstances, many are sufficiently specific to survive a motion to dismiss given their context and clear inaccuracy.").  On the contrary, these are direct and affirmative statements concerning the *safety of its dams*—a topic that it "put at issue"— which Vale purportedly achieved with the help of the best consulting engineers in the industry and adherence to  a rigorous audit process.  *See, e.g.*, Compl., ¶ 245.

While Vale publicly touted its creation and reliance on the PIESEM panel, it purposely failed to disclose its routine disregard of the PIESEM panel's expert guidance when it did not suit Vale's objectives.  For example, Vale repeatedly rejected its experts' advice on important topics including adherence to a 1.3 safety factor and rejection of unreliable laboratory data.  *Id.* at ¶ 248.  Vale also did not disclose that the PIESEM panel had frequently found inconsistences and problems with the audits and liquefaction assessments, thereby indicating that Vale's

[7] The Court already held in the Class Action that the misrepresentations Vale challenges (or statements that are substantively identical) are actionable.  *See In re Vale S.A. Sec. Litig.*, 2020 WL 2610979, at *19 (appendix holding that misrepresentations alleged in ¶ 197 of the Class Action complaint are actionable). Paragraph 197 of the Class Action complaint alleges in relevant part that in its ESG Webinar materials, Vale stated that "[a]ll of Vale's iron ore dams are safe and operating within normal limits," and that "[t]he panels of national and international experts are of great importance and contribute by bringing a critical view on Vale's management model, the methodologies used throughout the process and acting as consultants on safety issues."  *In Re Vale S.A. Sec. Litig*, No. 19-cv-526-RJD-SJB (E.D.N.Y), Dkt. No. 47.

stability certifications were unreliable.  *Id.*  As the Court earlier held in the Class Action,

reassuring statements that promoted confidence in the safety of Vale's dams are actionable:

> Plaintiff sufficiently alleges that this statement "lulls the reader into a false sense of
> security" as to the strength of Vale's risk management and *safety practices where it*
> *omitted facts such as: dams did not comply with the international 1.3 factor of safety*
> *recommendation* [and that] at least one DCE was based on methodologies  condemned by
> Potamos and the PIESEM panel . . . and external auditors were unduly influenced to issue
> DCEs….

*In re Vale S.A. Sec. Litig.,* 2020 WL 2610979, *at* *15 (emphasis added).

Similarly, the allegations contained in ¶¶ 222 and 245 of the Complaint are directly

related to Vale's safety practices and therefore are of obvious importance to investors, especially

when read within the context of the entire Complaint.  Furthermore, questions of puffery are not

suited for decision on a motion to dismiss: "Determining if a statement is puffery requires a fact-

specific analysis; while a statement 'might be mere puffery or insufficiently specific to support

liability in some contexts, it [may] clearly [be] a material misrepresentation' in others."  *Id.* at

*10.  Even Vale cites a case where the question of whether statements were "mere puffery" was

not decided until the summary judgment stage when the court had the benefit of a complete

record.  *See Fogel v. Vega*, 759 F. App'x 18, 23 (2d Cir. 2018).  Accordingly, when the above

factual statements are properly contextualized, it is clear that they are not puffery but rather

material misstatements that must be assessed by a fact finder.

## III.    THE COMPLAINT THOROUGHLY ALLEGES FACTS THAT ARE MATERIAL TO A REASONABLE INVESTOR.

Materiality is a "fact-specific inquiry" that "depends on the significance the reasonable

investor would place on the withheld or misrepresented information" and, as such, is an issue to

be decided by the fact finder.  *Basic*, 485 U.S. at 240.  "At the pleading stage, a plaintiff satisfies

the materiality requirement of Rule 10b–5 by alleging a statement or omission that a reasonable

investor would have considered significant in making investment decisions," *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 161 (2d Cir. 2000), and a complaint may be dismissed only if "the misstatements are 'so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'" *IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scot. Grp., PLC*, 783 F.3d 383, 390 (2d Cir. 2015).

The safety of Vale's tailings dams was of great importance to investors. Indeed, the Court has previously held, when assessing the materiality of similar allegations in the related Class Action, that false statements about dam conditions were material. *In re Vale S.A. Sec. Litig.*, 2020 WL 2610979, at *10 ("[T]he Court rejects Vale's baseless contention that representations that its dams were 'impeccable,' [] and 'all the structures in the Ferrous area are completely normal,' [] were obviously immaterial."). Vale repeatedly made statements about dam safety, after the Fundão Dam collapse, to address investor concerns and to buttress its stated commitment to sustainability and zero harm to the environment and people. Compl., ¶¶ 4-17. As a mining company, the stability and safety of Vale's many dams was plainly material to investors. Indeed, immediately after the collapse of Dam 1, Vale's credit rating was downgraded to "junk" status and the price of its ADS fell by 25%. *Id.* at ¶ 212.

Notwithstanding the specific allegations of material misconduct, Vale claims that "the allegedly omitted information—concerning only one of Vale's more than 150 tailings dams or dikes, which was previously shut down—was far too granular to meet this standard." Mot., 38. That Vale had 150 dams is irrelevant. Since 2003, Vale was aware that Dam 1 was dangerously fragile and, after the Mariana dam disaster, it identified Dam 1 as *one of six* critical dams that presented a serious risk of liquefaction failure. Compl., ¶ 12. Vale at all times knew that Dam 1 was a high damage potential dam whose collapse would have catastrophic consequences. Dam 1

36

posed a material safety risk prior to its collapse and therefore was *not* a "granular" risk that could be ignored. *Id.* at ¶¶ 6-7, 11-12. Thus, the stability of Dam 1 is not "so obviously unimportant to a reasonable investor" that it can be held immaterial as a matter of law. *See IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund*, 783 F.3d at 390.

Vale argues that the use of lab data (instead of field data) is "'far too attenuated from the alleged' misrepresentation as to Dam 1's safety." Mot., 38. To the contrary, the *only* way that Auditor A was able to conclude that Dam 1 met minimum safety standards was by relying on the faulty lab data. Compl., ¶ 82. Of course investors would find it important to know that the Liquefaction Expert, the PIESEM panel, Engineering Firm One, and Auditor C all agreed that the laboratory data could not be used as Auditor A did and that without that data, the dam did not meet minimum safety standards and was at an unacceptable risk of collapse due to liquefaction. The allegations regarding the use of lab data (*see, e.g.*, *id.* at ¶¶ 58, 64, 70-75) are not "attenuated" but rather are an essential part of the misconduct that supports the SEC's allegations that Vale misrepresented to investors the safety of Dam 1. *Id.* at ¶ 29. In any event, the significance of Vale's improper reliance on lab data within the context of all of the Complaint's allegations must be decided by a jury with the benefit of evidence.

Vale then argues that "the SEC does not allege that merely having a safety factor of 1.09 . . . mean[s] that a dam is unsafe." Mot., 39. But that is precisely what the Complaint alleges: "[A] safety factor of less than 1.3 for the peak, undrained condition indicated that the dam's tailings were at an unacceptably heightened risk of liquefaction in the event of a trigger. As a result, a dam with a peak, undrained safety factor less than 1.3 could not properly be certified as stable and safe." Compl., ¶ 37. Vale internally acknowledged that 1.3 was the minimum standard (*id.* at ¶ 35), and each of the four engineering auditor firms Vale hired in the relevant

37

period to conduct safety audits and failure probability assessments of Dam 1 confirmed that conclusion. *Id.* at ¶ 36. It is fanciful for Vale now to argue that the complaint does not allege that a "safety factor of 1.09" does not mean the dam is unsafe.

Finally, Vale speculates what it might have done if it had not applied a safety factor of 1.3 by musing that "if Vale had disclosed this information, *it would have* contextualized such disclosures…." Mot., 39 (emphasis added). This proffered theoretical disclosure, however, is irrelevant to any of the Complaint's allegations. Vale also misses the mark with its argument that the SEC does not explain the materiality of it not "reporting a safety factor of 1.09 instead of 1.3 for a dormant dam…." *Id.* First, various disclosures that Vale made to investors (Compl., ¶¶ 219-253) assured the market that it was applying best engineering practices, which *required at least a 1.3 factor* to be certified as safe and stable. *Id.* at ¶¶ 35-37. If Vale was indeed deviating from that standard, then it should have informed investors that it was *not* always applying international guidelines and best practices and that Dam 1 could not be certified as safe so that investors could make their own informed decisions. Instead, Vale lulled investors with false assurances that it followed best practices but then did something less. *Id.* at ¶ 37. Vale also argues that Dam 1 was "dormant," but that does not change the fact that Vale knew it had a safety factor far below international guidelines of 1.3 *before* its collapse and could not be certified as safe. The potential catastrophic risks associated with Dam 1, which were known by Vale, were no less simply because it was dormant. *Id.* at ¶ 191. The Complaint adequately pleads materiality.

## IV.    THE COMPLAINT ALLEGES FRAUDULENT CONDUCT BEYOND MISSTATEMENTS

Exchange Act Rules 10b-5(a) and (c) and Securities Act Sections 17(a) and (c) prohibit the use of fraudulent conduct. While the SEC must allege "something beyond misstatements and

omissions," *S.E.C. v. Rio Tinto PLC*, 41 F.4th 47, 53 (2d Cir. 2022), to state a claim under these provisions, the Complaint is replete with such allegations, as Vale itself acknowledges. *See* Compl., ¶¶ 47-188; Mot., 40. Vale engaged in a multi-year course of deceptive conduct to secure several unfounded and improper DCEs for Dam 1, which Vale filed with government authorities. In audit after audit, Vale employees kept critical information from its auditor regarding the flawed and unreliable nature of the laboratory tests and Dam 1's dangerously low safety factors that revealed the dam's fragile and conditionally unsafe state and unacceptable heightened risk of failure from liquefaction. Vale replaced auditors who would not alter their analyses to suit Vale's ends and pressured another auditor, both with threats of cutting off future business and the possibility of additional future contracts, to conform its conclusions to Vale's needs by ignoring international best practices and safety standards. The Complaint's allegations of deceptive conduct thus adequately support the SEC's scheme claim. *See, e.g., S.E.C. v. MiMedx Group, Inc.*, No. 19 Civ. 10927 (NRB), 2022 WL 902784, at \*11 (S.D.N.Y. Mar. 28, 2022) (court held that the complaint "adequately alleges that [defendant] engaged in deceptive acts beyond issuing misstatements, including his concealment of material facts from MiMedx's Audit Committee and auditors").[8]

The Second Circuit's holding in *Rio Tinto* is not to the contrary. In that case, the court carefully limited the scope of its holding, stating that that it was *not* considering whether

---

[8] *See also S.E.C. v. Takeyasu*, No. 1:17-CV-4866, 2018 WL 2849777, at \*19 (S.D.N.Y. June 11, 2018) (denying motion to dismiss where Commission alleged top executives responsible for accounting were aware of improper accounting but did not take "steps to correct the failed internal controls" and "turned a blind eye" to "allegations of failing internal controls"); *In re Bank of Am. Corp. Sec., Derivative & ERISA Litig.*, No. 09-MD-2058, 2011 WL 3211472, at \*5-9 (S.D.N.Y. July 29, 2011) (plaintiffs pleaded a claim for liability where Chief Financial Officer was "personally informed" of huge losses but failed to inform disclosure counsel, leaving them "out of the loop" and "imped[ing]" them "from making a fully informed analysis").

corruption of an audit process or conceal information from auditors would constitute fraudulent conduct sufficient to give rise to liability under Rule 10b-5(a) and (c) or Section 17(a)(1) and (3). *Rio Tinto*, 41 F.4th at 54.  *See also SEC v. Stubos*, 2022 WL 6776741 (S.D.N.Y. Oct. 11, 2022) (the Second Circuit in *Rio Tinto* did not hold that "dissemination" of a false statement is the only way to prove a scheme claim).

The allegations concerning deceptive acts amount to "something beyond a misstatement," and scheme liability therefore should be decided by a fact finder.

## V.   IN THE ALTERNATIVE, IF THE COURT GRANTS ALL OR A PART OF VALE'S MOTION TO DISMISS, THE SEC REQUESTS LEAVE TO AMEND THE COMPLAINT

In the alternative, if the Court grants all or a part of Vale's motion to dismiss, the SEC requests leave to amend the Complaint under Federal Rule of Civil Procedure 15(a).  Leave for amendment would be particularly appropriate here because there have been no previous amendments and no discovery has been conducted.  *See Pasternack v. Shrader*, 863 F.3d 162, 174 (2d Cir. 2017) (vacating trial court's denial of motion to amend when no discovery had occurred and amendment would not affect a scheduling order).

## CONCLUSION

For the forgoing reasons, the Commission respectfully submits that Vale's Motion to Dismiss the Complaint should be denied in its entirety.

Dated:  November 17, 2022
         Washington, D.C.

                              Respectfully submitted,

                              */s/ Dean M Conway*
                              Dean M. Conway
                              S. Yael Berger
                              Counsel for Plaintiff
                              U.S. Securities and Exchange Commission
                              100 F. Street, N.E.
                              Washington, D.C. 20549
                              (202) 551-4412 (Conway)
                              conwayd@sec.gov

## <u>CERTIFICATE OF SERVICE</u>

I certify that on November 17, 2022, a copy of the foregoing document was served upon all counsel of record via email.

*/s/ Dean M. Conway*
Dean M. Conway